# THE L. P. DAYTON.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

Argued January 21, 24, 1887. — Decided February 7, 1887.

If a vessel in tow by one steam-tug collides on navigable waters with a vessel in tow by another steam-tug and is injured, and the two tugs are libelled in one proceeding in admiralty to recover damages for the injuries sustained, the burden of proof is on the libellant to establish negligence against each tug separately; and admissions in the answer on the part of one tug cannot be used against the other tug to relieve the injured vessel of this burden.

The rule which presumes fault in case of a collision against a vessel in motion in favor of one at anchor does not apply to the case of a vessel moved by a steam-tug colliding with another vessel moved by another steam tug.

If a vessel towed by a steam-tug, colliding with a vessel towed by another steam-tug, libels the other steam-tug, its rights in the suit and its standing in court will be the same which its own steam-tug would have had, in case the collision had been directly with her; but if it libels its own steam-tug, the latter is responsible, under its contract of towage, only for the results happening from the want of ordinary care on its part.

The relative position of the steam-tug of the other tow to the appellant and its tug, before and up to the instant before the accident, and its action during that time, were not such as to constitute a violation of Rev. Stat. § 4233, rule 19, that "if two vessels under steam are crossing so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other."

THE appellant, Thomas McNally, filed his libel in a cause of collision, civil and maritime, against the steam-tug L. P. Dayton, the steam-tug James Bowen, and the float or scow called Number Four, in the District Court of the United States for the Southern District of New York. The second article of the libel set out the cause of action as follows:

"2d. Heretofore, to wit, on the fourteenth day of February, 1879, the boat or barge Centennial, of the burden of about 300 tons, of which boat your libellant was master, was taken in tow by the steam-tug L. P. Dayton at the pier foot of Fifty-ninth Street, New York harbor, to be towed by the said

tug to the Erie basin, near Atlantic docks, New York harbor. She was taken at or about five and one-half o'clock in the afternoon of that day. She was loaded with a valuable cargo, to wit, six thousand four hundred and fifty bushels, or thereabouts, of red wheat. She was then stanch and seaworthy. When the L. P. Dayton left Fifty-ninth Street pier she had in tow four boats or barges, of which the boat Centennial was one; these were placed two on the port side of the said tug and two on her starboard side. The Centennial was the inside starboard boat — that is, the one lashed to the starboard side of the tug Dayton. The Centennial was a boat one hundred and three feet in length, and when fastened to the tug, as aforesaid, her bow projected some twenty feet beyond the bow of the said steam-tug. The evening was quite clear and starlit. The tug and tow being made up as aforesaid proceeded down the river, the tide being ebb, until about opposite Eagle pier, Hoboken, when the tug put into shore and there left one of the boats that had been fastened to her port side.

"After the port boat had been left at the Eagle pier as aforesaid, the tug, with the remaining three boats, resumed her course, proceeding down the river. When about opposite Pier 1, North River, and when about three hundred yards from the New York shore, the said boat Centennial was run into by the float or scow called Number Four, which was then in tow of the steam-tug James Bowen, and received such injuries that she very soon thereafter sunk with her cargo. At the time of the collision darkness had set in, and your libellant is unable to speak of his own knowledge with entire accuracy of the movements of the vessels aforesaid. But he is informed and believes the truth to be as follows, that is to say:

"Before the collision aforesaid the steam-tug James Bowen, having the float or scow Number Four lashed to her port side, was proceeding from some point on the East River to the Long Dock, Jersey City. She had rounded the Battery, and at the time of the collision was on a course opposite or nearly opposite the course then being taken by the tug L. P. Dayton

Statement of Facts.

and her tow. Through the carelessness of both of the persons in charge of the L. P. Dayton and of the James Bowen and the scow, the said tows were not kept clear of each other, though there was ample space of water in which to have done so, but were so negligently handled that the float or scow aforesaid bore right down on and struck full on her stem the boat Centennial, staving in her whole bow and causing her to sink in about ten minutes.

"Your libellant and his son were on board the Centennial at the time of the collision, but it was not possible for them to do anything to prevent the same. The Centennial was entirely under the control and subject to the direction of the tug-boat L. P. Dayton, having neither propelling nor steering power of her own.

"Your libellant alleges that both the steam-tugs aforesaid were in fault in the following respects :

"First. Neither tug-boat observed the signals of the other, the observation of which might have and would have prevented danger.

"Second. Neither tug-boat made use of the proper signals for avoiding a collision in time to avoid the same.

"Third. The tug-boat Bowen did not reverse her movement, or did not do so in time to prevent a collision.

"Fourth. Neither tug-boat was provided with a suitable and competent watch at and before the time of the collision.

"Fifth. The tug-boat James Bowen improperly changed her course before the collision, having put her wheel to 'port and made an effort, apparently, to pass under the bows of the Dayton and her tow.

"But your libellant alleges, in general, negligence against both the said tugs, and requires them to make definite answer of the facts pertinent to the collision, which will clearly show either that both were equally to blame, or to blame in unequal degree, though neither entirely free from blame; but, for the reasons above mentioned, your libellant's boat, the Centennial, was in nowise to blame or responsible for the collision aforesaid."

And also alleged negligence against the steam-tugs in addition, as follows :

"That on the night and at the time of the collision the tide was a strong ebb, that the tug Bowen and her tow were proceeding against the tide, and that it was negligence in her not to have kept more to the westward than she did, and thereby have avoided the tug Dayton and her tow, as might easily have been done had the proper care been used in observing the Dayton's lights and signals.

"And, further, that the said tug Bowen and her tow kept too near the New York shore in rounding the Battery and making up the North River.

"That the tug Bowen was also negligent in respect of not having a proper light set on her port side, or in permitting the same to be covered and obscured by certain cars or carriages at that time on the deck of the float, which was on her port side.

"That the tug Bowen was also negligent in not answering the signals of the tug Dayton when they were approaching each other.

"That the tug Dayton was at fault in proceeding at too great a speed, the tide being a strong ebb and the wind northwest.

"That the tug Dayton was likewise negligent in not having a proper light set on the extreme starboard and forward end of her tow.

"That the person in charge of the wheel of the Dayton at the time of and before the collision was unfit for such duty, being a man of near and imperfect sight, and generally incompetent.

"That the tug Dayton, after twice blowing her whistle, did not keep on her course, but ported her wheel and went to starboard, showing her red light to the Bowen and the float before reversing and attempting to go back.

"That neither the Dayton nor the Bowen had a watchman or lookout on her forward deck."

Hugh J. Jewett, Receiver of the Erie Railway Company, claimant of the float or scow called Number Four filed his answer on her behalf, in response to the charges of the libel. It was admitted, however, that no cause of action appeared

against the scow Number Four both in the courts below and upon the argument in this court. It is, therefore, not necessary to consider the answer filed on its behalf.

Daniel Shea intervened as owner of the tug James Bowen, and answered the charges of the libel as follows:

"Third. That this respondent has no knowledge of the matters contained in the second article of said libel preceding the allegation in the said article contained, to the effect that the boat Centennial was run into by the float or scow Number Four, and he therefore neither admits nor denies the same, but leaves the libellant to make such proof thereof as he may be advised; that, so far as the allegations of the said article relate to the collision between the said boat Centennial and the float or scow called Number Four, which occurred on the 14th day of February, 1879, and the causes thereof, this respondent, upon information and belief, denies the said allegations of said article, and each and every one of them, except so far as the same are hereinafter expressly admitted.

"And this respondent, upon information and belief, says that the facts in respect to said collision and the causes thereof are as hereinafter stated, and not otherwise, that is to say:

"On the evening of the 14th day of February, 1879, at about half-past six o'clock, the said steam-tug James Bowen, at Williamsburg, in the waters of the East River, took in tow the said float or scow Number Four, the said float or scow being lashed to the port side of said tug James Bowen, and the said tug James Bowen, with the said float or scow in tow as aforesaid, proceeded down the East River, bound for Long Dock, Jersey City; that the tide was ebb, the wind moderate from northwest; that the said tug James Bowen and the said float or scow were both stanch, properly manned and equipped; that the said tug was provided with a bright headlight on the forward end of her house, and with red and green lights on her port and starboard sides respectively, and with two white lights on the flagstaff aft, and that the said float was provided with a white headlight near the bow, all of said lights being properly placed and burning brightly; that the said tug James Bowen was provided with a compe-

tent pilot and lookout, properly placed on the tug, and that a
lookout was also stationed forward on the roof of the float or
scow; that the said tug James Bowen, with the said float or
scow in tow as aforesaid, proceeded down the East River to
the Battery, and on rounding the Battery into the North
River encountered considerable ice, and in consequence was
running very slow; that after getting clear of the ice the said
tug, with the said scow in tow as aforesaid, was headed for
the Jersey City abattoir. At this time there was outside of
the said float, and about one hundred feet distant from the
port side thereof, the steam-tug W. H. Vanderbilt, with two
barges in tow astern on a hawser; that said tug W. H. Van-
derbilt, with her said tow, was proceeding in the same direc-
tion and at a little faster rate of speed than the James Bowen;
that after the said James Bowen, with the said scow or float
in tow, had gotten into clear water and was heading as last
aforesaid, a boat was discovered by her pilot coming down the
river with a tow, which subsequently turned out to be the
L. P. Dayton; that at the time the said approaching tug
and tow were discovered the green light of the tug L. P.
Dayton was visible, and she appeared to those in charge of
and navigating the tug James Bowen, including the lookout
on the float, to be going to the eastward, between the said
James Bowen and the New York shore, which was then
about three hundred yards distant. At a proper distance the
pilot in charge of the James Bowen blew two blasts of his
steam whistle, to which the approaching tug, L. P. Dayton
responded with two blasts of her whistle, and the pilot in
charge of the said James Bowen thereupon put his wheel to
starboard, heading as close to the westward as could safely be
done without danger of colliding with the tug W. H. Van-
derbilt or the barges in tow thereof, which were, as before
stated, on the port side of the said float, heading in the same
direction; that notwithstanding the signal which had been
given by the James Bowen, and which had been answered
by the L. P. Dayton, the pilot of the said L. P. Dayton,
instead of keeping his course or putting his wheel to starboard
so as to pass the said James Bowen on her starboard side, so

changed his course as to shut out his green light and bring his red light in view of those navigating the James Bowen; that thereupon, it being evident that the said tug L. P. Dayton could not cross the bow of the James Bowen and of the said float in tow thereof without imminent danger of collision, the pilot in charge of the James Bowen immediately rang his bells to slow, stop, and back; that said signals were promptly answered by the engineer of the James Bowen, and that at the time of the collision the heading of the James Bowen and of the float in tow thereof was about stopped, and that those in charge of the said L. P. Dayton and the canal-boats or barges in tow thereof so navigated the same that the bow of the canal-boat or barge on the starboard side of the L. P. Dayton was brought into collision with the bow of the said float or scow Number Four with such force as to break the tow-line from the said scow or float Number Four to the James Bowen, and to crush in the bow of the said barge or canal-boat on the starboard side of the L. P. Dayton, and that, as this respondent is informed and believes, the said barge or canal-boat was the barge or canal-boat called the Centennial in the libel in this cause mentioned, and that in consequence of said collision the said barge or canal-boat Centennial subsequently sank; that the place where the said collision occurred was about opposite Pier 1, North River, and from three hundred to three hundred and fifty yards from the head of said pier.

" And this respondent, upon information and belief, says that the said collision was in no way occasioned by any fault on the part of the said float or scow Number Four, or of the said tug James Bowen, or of those in charge thereof, but was occasioned by and due wholly to the fault of those navigating and in charge of the said tug L. P. Dayton and the said barges or canal-boats in tow thereof in the following respects :

" 1. That the pilot in charge of the tug L. P. Dayton and of the said canal-boats in tow thereof, including the said Centennial, was not a competent person for the purpose, being a man of near and imperfect sight and generally incompetent.

"2. That the L. P. Dayton, at the time of the said collision, while navigating the waters of the Hudson River and engaged in towing canal-boats or barges, failed and omitted to have white lights placed in the extreme outside of the tow on either hand.

"3. That the pilot in charge of the said tug L. P. Dayton and the canal-boats or barges in tow thereof, after having received and answered the signal of two blasts from the steam whistle of the James Bowen, instead of keeping to the eastward and passing the said James Bowen on her starboard side, improperly changed his course so as to cross the bows of the said James Bowen, thereby bringing the bow of the said canal-boat Centennial into collision with the said float or scow Number Four.

"4. That the said tug L. P. Dayton, when danger of collision became imminent, did not in season reverse her engine, so as to prevent a collision.

"5. That the said tug-boat L. P. Dayton was not provided with a suitable or competent lookout properly stationed at and before the time of the collision.

"6. That the said tug L. P. Dayton was also negligent in proceeding at too great a rate of speed, the tide being ebb and the wind from the northwest.

"7. That the said tug L. P. Dayton, after twice blowing her whistle as aforesaid, did not keep on her course, but ported her wheel and went to starboard, showing her red light to the James Bowen and the said float before reversing and attempting to go back.

"And this respondent, upon information and belief, says that the said collision was in no way due to any fault on the part of the said scow or float Number Four or of the said tug James Bowen, and upon information and belief he denies each and every allegation in the said libel and in the supplement filed thereto contained charging or imputing any fault or negligence whatever to the said float, or those in charge thereof, or the said tug James Bowen, or those in charge thereof, and each and every allegation in the said libel contained respecting the said collision, except as hereinbefore expressly admitted."

Statement of Facts.

Arthur B. Twombly, as surviving partner of Whitney & Twombly, intervened as owner of the steam-tug L. P. Dayton, and answered the libel as follows:

"Second. This respondent admits that on the 14th day of February, 1879, the boat Centennial, of the burden of about 300 tons, and of which the libellant was master, was taken in tow by the steam-tug L. P. Dayton, at the pier foot of Fifty-ninth Street, New York, to be towed to the Erie basin, at about half-past five o'clock P.M., and that she was loaded with a cargo of wheat, of the quantity of which he is not informed, nor is he informed whether the said boat was then staunch and seaworthy, but leaves the libellant to make such proof in reference thereto as he shall be advised.

"He admits that when the Dayton left Fifty-ninth Street pier she had in tow four boats, two on each side, and that the Centennial was the inside starboard boat; that she was one hundred and three feet in length, and that her bow projected some twenty feet beyond the bow of the steam-tug L. P. Dayton; that the evening was clear and starlit and the tide ebb, and that the tug landed one of the boats that had been on her port side at the Eagle pier, Hoboken, and that she thereafter pursued her course with the remaining three boats, and that when about opposite or a short distance above Pier No. 1, North River, and about three hundred yards from the piers on the New York shore, the Centennial was run into by the scow Number Four, which was then in tow of the steam-tug James Bowen, and received such injuries that she sank with her cargo.

"And he admits that the said scow was lashed on the port side of the James Bowen and that the said tug and scow were proceeding from a point in the East River to the Long Dock, Jersey City, and that at the time of the collision she was on a course opposite or nearly opposite the course then being taken by the L. P. Dayton and her tow.

"He denies that it was through any carelessness of the persons in charge of the L. P. Dayton that said tows were not kept clear of each other.

"He admits that the Centennial was under the control

and subject to the direction of the L. P. Dayton, having neither propelling nor steering power of her own.

"And as to the various allegations of fault on the part of the L. P. Dayton, he denies the same and each one of them.

"And as to the allegations in said libel in respect to the damages sustained by the libellant, he has no knowledge and leaves the libellant to his proof thereof.

"And he further avers that said tug. L. P. Dayton was wholly without fault which caused or contributed to said collision, and the same was wholly caused by fault of those on board and in charge. of the said tug James Bowen and said scow Number Four, as alleged in said libel.

"And he alleges that the tug L. P. Dayton was well and properly manned and had the requisite lights set and burning brightly according to law, and that the tow was in all respects properly made up; that the two tugs were approaching in such a way that the proper course was for each to pass on the starboard side of each other, and that the proper measures were taken by said tug L. P. Dayton to pass in that manner and the proper signals were blown, but that said tug James Bowen failed to give heed to said signals and to take proper measures to pass on the starboard hand of said tug L. P. Dayton and the boats in her tow, but so negligently navigated as to bring the said scow against the said boat Centennial and also the boat on the port side of the L. P. Dayton."

The case was heard in the District Court on the pleadings without testimony, and a decree was passed dismissing the libel. 10 Ben. 430. On appeal to the Circuit Court, the case was again submitted on the pleadings alone, when the same decree was rendered. 18 Blatchford, 411. The present appeal was from that decree, and presents the single question of law: whether upon the pleadings, without testimony, there is error in that decree.

Mr. *Edward D. McCarthy*, for appellant, cited : *The Scioto*, 2 Ware, 359 ; *The Nautilus*, 1 Ware, 529 ; *The Alabama and The Gamecock*, 92 U. S. 695 ; *The Johnson*, 9 Wall. 146 ; *Sproul* v. *Hemmingway*, 14 Pick. 1 ; *S. C.* 25 Am. Dec. 350 ;

*Sturgis* v. *Bowyer*, 24 How. 110; *The Atlas*, 93 U. S. 302; *Clark* v. *Barnwell*, 12 How. 272; *Canfield* v. *Balt. & Ohio Railroad*, 93 N. Y. 532; *Stokes* v. *Saltonstall*, 13 Pet. 181; *Platt* v. *Hibbard*, 7 Cowen, 497; *Clark* v. *Spence*, 10 Watts, 335; *Beardslee* v. *Richardson*, 11 Wend. 25; *S. C.* 25 Am. Dec. 596; *Doorman* v. *Jenkins*, 2 Ad. & El. 256; *Ware* v. *Gay*, 11 Pick. 106; *Christie* v. *Griggs*, 2 Campb. 79; *Transportation Co.* v. *Downer*, 11 Wall. 129; *The Marpesia*, L. R. 4 P. C. 212; *The Benmore*, L. R. 4 A. & E. 132; *The Abraham*, 2 Aspin. 34; *The Bolina*, 3 N. of Cas. 208; *Scott* v. *London, &c., Dock Co.*, 3 H. & C. 596; *The Quickstep*, 9 Wall. 665; *Dutton* v. *The Express*, 3 Cliff. 462; *The Express*, Olcott Adm. 258; *S. C.* 1 Blatchford, 365; *The Rhode Island*, Olcott Adm. 505; *Treadwell* v. *Joseph*, 1 Sumner, 390; *The John Adams*, 1 Cliff. 404; *The Lochlibo*, 3 W. Rob. 310; *The Gautier*, 5 Ben. 469; *The Sea Nymph*, Lush. 23; *The Webb*, 14 Wall. 406; *The Brazos*, 14 Blatchford, 446; *Ins. Co.* v. *Newton*, 22 Wall. 32; *Carver* v. *Tracy*, 3 Johns. 427; *Wailing* v. *Toll*, 9 Johns. 141; *Fenner* v. *Lewis*, 10 Johns. 38; *Credit* v. *Brown*, 10 Johns. 365; *Burmon* v. *Woodbridge*, 2 Doug. 781; *Rex* v. *Clews*, 4 C. & P. 221; *Delamater* v. *Pierce*, 3 Denio, 315; *Bearss* v. *Copley*, 10 N. Y. 93; *Barnes* v. *Allen*, 30 Barb. 663; *Trimleston* v. *Kemmis*, 9 Cl. & Fin. 749, 780–784; *Morrison* v. *Clark*, 7 Cush. 213; *Cent. Bridge Co.* v. *Butler*, 2 Gray, 130; *de Nemours* v. *Vance*, 19 How. 162; *Pope* v. *Nickerson*, 3 Story, 465; *The Clement*, 2 Curtis, 363.

*Mr. Joseph F. Mosher*, for the L. P. Dayton (*Mr. James E. Carpenter* was with him on the brief), cited: *Transportation Line* v. *Hope*, 95 U. S. 297; *The Margaret*, 94 U. S. 494; *The Webb*, 14 Wall. 406; *The Brazos*, 14 Blatchford, 446; *The Brooklyn*, 2 Ben. 547; *The Frank G. Fowler*, 21 Blatchford, 410; *The M. Vandercook*, 24 Fed. Rep. 472; *The Quickstep*, 9 Wall. 665; *The Deer*, 4 Ben. 352; *The W. E. Gladwish*, 17 Blatchford, 77; *The B. B. Saunders*, 23 Blatchford, 378; *The New Champion*, Abbott Adm. 202; *The William Young*, Olcott Adm. 38; *The Neptune*, Olcott Adm. 483, 493; *The Breeze*, 6 Ben. 14; *The Columbus*, Abbott Adm. 384; *The Summit*, 2 Curtis, 150; *The Eri*, 3 Cliff. 456, 460; *The*

*Kallisto*, 2 Hughes, 128; *The Ligo*, 2 Hagg. Adm. 356, 360; *The Bolina*, 3 N. of Cas. 209; *The Adolph*, 4 Fed. Rep. 730; *The Marpesia*, L. R. 4 P. C. 212; *The Abraham*, 2 Asp. N. S. 34; *The Benmore*, L. R. 4 A. & E. 132.

*Mr. William D. Shipman* for the Bowen.

*Mr. Charles M. Da Costa*, for appellant, cited the following cases not cited by *Mr. McCarthy*: *The George*, 9 Jur. Pt. I, 670; *The Victoria*, 3 W. Rob. 49; *The Telegraph*, 1 Spinks, 427; *S. C.* 8 Moore P. C. 167; *The Hibernia*, 4 Jur. N. S. Pt. I, 1244; *The Bothnia*, 2 Law Times N. S. 160; *The Despatch*, 3 Law Times N. S. 219; *The Annapolis*, 5 Law Times N. S. 326; *The Kepler*, 2 P. D. 40; *The Glengarry*, 2 P. D. 235; *The Andalusian*, 3 P. D. 182; *The La Cahapool*, 7 P. D. 217; *The George Roper*, 8 P. D. 119; *The Louisiana*, 3 Wall. 164; *The Granite State*, 3 Wall. 310; *The Syracuse*, 12 Wall. 167; *The Clarita and Clara*, 23 Wall. 1; *The Belknap*, 2 Lowell, 281; *Sterling* v. *The Jennie Cushman*, 3 Cliff. 636; *The Julia M. Hallock*, Sprague, 539; *The Bridgeport*, 7 Blatchford, 361; *The Delaware*, 20 Fed. Rep. 797; *The Brady*, 24 Fed. Rep. 300; *The Charlotte Raab*, Brown Adm. 453; *Hall* v. *Little*, 2 Flipp. 153; *The Fremont*, 3 Sawyer, 571; *Rose* v. *Transportation Co.*, 20 Blatchford, 411; *Mullen* v. *St. John*, 57 N. Y. 567; *Seybolt* v. *N. Y., Lake Erie & Western Railroad*, 95 N. Y. 562; *Feital* v. *Middlesex Railroad*, 109 Mass. 398; *Philadelphia & Reading Railroad* v. *Anderson*, 94 Penn. St. 351; *Iron Railroad* v. *Mowery*, 36 Ohio St. 418; *Pittsburg, Cincinnati & St. Louis Railroad* v. *Williams*, 74 Ind. 462; *Eagle Packet Co.* v. *De Fries*, 94 Ill. 598; *Byrne* v. *Boadle*, 2 H. & C. 721; *Bridges* v. *North London Railway*, L. R. 6 Q. B. 377.

Mr. JUSTICE MATTHEWS, after stating the case as reported above, delivered the opinion of the court.

The ground on which the Circuit Court proceeded is, that as the libel alleges negligence and fault in various particulars as against the tug L. P. Dayton and the tug James Bowen,

which are denied in the several answers of the respective claimants, in opposition to which the libellant has proven no negligence or fault on the part of either, the libel must be dismissed, as the burden of proof lies upon the libellant to establish a case of negligence against one or the other, or both of the respondents, and that this burden of proof is not changed or shifted by reason of any allegations of fault contained in the answer of either respondent as against the other. On the other hand, it is contended on the part of the libellant, that while it is true that each of the defendants denies the negligence charged against it, yet both the answers show that the loss must have been occasioned by the fault of one of the defendants, and that being so, the law casts upon each defendant the burden of making good its allegations of fault against the other, in order to exonerate itself.

The proposition is stated by one of the counsel for the appellant, in his printed argument, as follows: "A vessel, without propelling or steering power, lashed to the side of a tug, is sunk, as the result of a collision between such tug and another one. In a libel filed by the tow against both tugs, to which answers are interposed, in neither of which is negligence causing or contributing to the collision attributed to the tow and by which each tug seeks to exculpate itself and inculpate the other, a *prima facie* case of negligence arises without the necessity of proving the specific acts of negligence by either or both tugs, and that the decree to be entered in favor of the libellant, either against one tug alone or against both, is dependent entirely upon the nature of the evidence which it is incumbent upon the tugs to produce, in order to determine as between themselves the issues so made by them by their respective answers."

The propriety and soundness of this rule is supposed in argument to rest upon two general grounds: 1st. It is contended that the tow which was injured by the collision is in the same category, as respects both tugs, as that of a vessel at anchor injured by a collision with a moving vessel, where the burden of proof is upon the latter to show that it was without fault, or that the disaster was the result of fault on the part of the com-

plaining party. 2d. That where it appears, as in the present case, that the tow, being helpless as to its own navigation, was without fault on its part, and it is manifest, from the circumstances appearing on the pleadings, that the collision was caused either by the fault of one or the other of the tugs, or was the result of inevitable accident, the burden of proof rests upon each to establish such facts as excuse it. The argument is, that such a disaster could only occur from fault of navigation, or from that *vis major* which is styled inevitable accident; that by the supposition the appellant is free from fault; that consequently it must be that either there was fault on the other side or inevitable accident, in either of which cases it is incumbent upon the respondent affirmatively to establish its excuse.

It is also contended for the appellant, that if the truth of the general rule must be admitted, that he who seeks judicially to establish a claim based upon an alleged default of his adversary must affirmatively establish by proof the facts which justify his complaint; and that the burden of proof, as a principle of general jurisprudence, is assumed by the plaintiff, unless the cause of action is confessed or admitted judicially by the defendant; yet, it is also true, that if the defendant accompanies a general denial of the alleged cause of action with the admission of such facts as in law constitute his liability, the plaintiff's case is in fact admitted without other proof. And that, in this aspect, the libellant was entitled to a decree below on the basis of certain admissions of fact in each of the answers inconsistent with the general denials of fault.

In our opinion, the burden of proof was upon the appellant to establish a case of negligence against each of the tugs separately and independently. The rule which presumes fault in a case of collision, against a vessel in motion in favor of one at anchor, does not apply. In the present case, the tow, which was injured, was not at rest as respects either of the tugs. As against the Bowen, the movement and navigation of the tow was under the control and management of the Dayton; and in a suit against the Bowen, the tow can have no other or greater rights, and no other of better standing in court, than would the Dayton have had in case the collision had been

directly with her, because the tow in such a suit is identified with its own tug, so far, at least, that she cannot escape the consequences if the collision was caused wholly or in part by the fault of that tug. *The Civilta and The Restless*, 103 U. S. 699; *Sturgis* v. *Boyer*, 24 How. 110; *The J. H. Gautier*, 5 Ben. 469; *The Cleadon*, Lush. 158.

It follows, therefore, that, as respects the Bowen, the same burden of establishing the fault charged against it rests upon the libellant in this case, as the law would impose upon the Dayton if she were the libellant prosecuting for damages on its own behalf, as to which there could be no question.

As between the tow and its tug, the Dayton, the contract of towage involves a responsibility for loss upon the tug only by reason of the want of ordinary care; for a tug is not a common carrier, and does not insure the safety of its tow. In some cases the facts of the collision, as admitted in the pleadings, might constitute a *prima facie* case of negligence, which would impose upon the tug the duty of explanation and exoneration; but no such presumption of fault arises in the present case. Here there was a collision between the tow of one tug and the tow of another, which may have been caused by a fault of navigation upon the part of one or both of the tugs. Each charges fault against the other. As the matter stands, it is indeterminate, being a mere matter of controversy to be adjudged between them upon proof of all the circumstances. In favor of the injured tow, the libellant in this case, there is no presumption of fault as against either, nor against both jointly. There is no presumption against the Bowen, for the reason we have already stated; there is none against the Dayton, because on her behalf all the alleged negligence is denied, and the contrary allegations of the libel cannot be legally maintained merely by corresponding allegations in the answer of the Bowen. To hold otherwise would require that in every case, as between the tow and its tug, the latter should be required affirmatively to establish its defence against the presumption of its negligence. There is no ground, in reason or authority, for making such an exception to the general rule, which requires the plaintiff, in the first instance, to establish

by proof the allegations of its complaint. It does not tend to establish such an exception that it appears by the record that one or the other of the respondents must have been so in fault as to be liable for the consequences. It still remains that there is a controversy as to which of the two is guilty, and no decree can pass without affirming the liability of one or both. That affirmation must stand upon proof, unless it appears on the record which one of the two is at fault, or that both are.

Neither is it material that the facts of the case and the causes of the collision are peculiarly within the knowledge of the respondents. It is alleged in the present case, as one of the inconveniences of the libellant's situation, that it would be compelled, in order to establish the allegations of the libel, to resort to the testimony of those navigating the respective tugs, and thus call witnesses interested to exonerate the vessel to which they were attached. We are not aware, however, of any ground on which such an inconvenience can affect the rule of law which governs the rights of the parties. And perhaps it is counterbalanced by the corresponding interest on the part of each set of witnesses to fix the fault upon the opposing vessel.

It is further argued on the part of the appellant, that it was entitled to a decree below, as against the Bowen, on the ground of admissions, in the answer filed on its behalf, affirmatively showing negligence and a violation of the rules of navigation tending to produce a collision. This aspect of the case was disposed of by the Circuit Court in the opinion of Mr. Justice Blatchford, which we adopt, as follows:

"It is urged for the libellants that the answer of the Bowen shows that she had the Dayton on her starboard side, with the courses of the two vessels crossing so as to involve risk of collision, and that, therefore, under rule 19 of § 4233 of the Revised Statutes, it was the duty of the Bowen to keep out of the way of the Dayton; and, as she did not, a *prima facie* case of negligence is thus made out against her by her answer. This is an error. The facts stated in the answer of the Bowen do not show that the courses of the two tugs were crossing when the Bowen discovered the Dayton. On the contrary,

the green light of the Dayton was then visible to the Bowen, and not her red light, and the Dayton appeared to be going between the Bowen and the New York shore, to the eastward, and in a direction which would cause her green light to still be visible to the Bowen, and her red light to be still invisible. This would ensure safety and no collision; and, to ensure it still more, the Bowen blew two whistles and the Dayton answered with two whistles. After that the Bowen starboarded. Even if — before so starboarding, and while so starboarding — the Bowen is to be considered as having the Dayton on her starboard side, with the courses of the two vessels crossing, (which is by no means clear on the averments in the answer of the Bowen,) her answer shows that she took proper measures to keep out of the way of the Dayton; that such measures were assented to at the time by the Dayton as proper, and that then the Dayton changed her course and went across the bow of the Bowen. Under these circumstances the Bowen slowed, stopped, and backed.

"The answer of the Bowen states substantially that there was imminent danger of collision if she kept on. There is nothing in all this to show negligence in the Bowen. When the Dayton so came suddenly across the bow of the Bowen, a case was not made within rule 19, although in that position the Bowen had the Dayton on her starboard side, and their courses were crossing; and even if it were, the answer shows that the Bowen did all she could to keep out of the way of the Dayton.

"The libel, so far from alleging that it was a fault in the Bowen to slow, stop, and back, alleges, as a fault in her, that she did not reverse, or did not do so soon enough. The isolated fact of her slowing, stopping, and backing cannot be taken away from the connection in which it is found in the answer and separated from the circumstances under which the answer states it occurred, particularly as the libel states distinctly that it was a fault in her not to reverse." 18 Blatchford, 411, 418.

*Decree affirmed.*