## THE E. E. SIMPSON.

## ROGERS v. MOORE.

### (Circuit Court of Appeals, Fifth Circuit. February 27, 1894.)

### No. 184.

TOWAGE—GROUNDING OF TUG—NEGLIGENCE.

A tug with a tow was going out of Mobile bay at night, where the channel is about a mile wide. The mate, who had no knowledge of the channel, suggested that they were too near Sand island on the west, and the master authorized him to hold off until the lights at Ft. Morgan were nearly on. This was done, but shortly after resuming her course the tug grounded. The master at first thought that they had struck on the west side, but on going to the wheelhouse he discovered, by the compass and the lights, that they were on the east side, whither the wind and tide both strongly tended to carry them. *Held*, that the ability to thus discover his position was proof of negligence in not using the compass ·and lights before, and the tug was liable for the consequent loss of the tow.

Appeal from the District Court of the United States for the Southern District of Alabama.

This libel was filed by Rittenhouse Moore against the steam tug E. E. Simpson (Isaac H. Rogers, claimant) to recover for the loss of the dredge. boat Lutin, which resulted from the alleged negligent grounding of the tug in Mobile bay. There was a decree for the libellant in the court below, and the claimant appeals.

The following opinion was delivered below by TOULMIN, District Judge:

There is no conflict in the evidence as to the material facts of this case; and the admitted law being that the tug was bound to bring to the performance of the duty she assumed reasonable skill and care, and to exercise them in everything relating to the work until it was accomplished, the question is whether the master of the tug was guilty of a want of reasonable care and skill in the management of his tow in any respect, as charged by the libelant. The want of reasonable care and skill is the want of ordinary care and skill,—such as would be exercised by a person of ordinary prudence under like circumstances. The want of either is a gross fault, and the tug would be liable to the extent of the full measure of the consequence. The Margaret, 94 U. S. 496. If the proof establishes that in what was done there was a lack of the usual care and skill, and that what was omitted to be done was within the power of the tug to do, and should have been done by any master of competent skill and experience, and that different conduct would probably have prevented the disaster, then the tug would be liable. "An engagement to tow does not impose either an obligation to insure or the liability of common carriers. The burden is always upon him who alleges the breach of such a contract to show, either that there has been no attempt at performance, or that there has been negligence or unskillfulness, to his injury, in the performance. Unlike the case of common carriers, damage sustained by the tow does not ordinarily raise a presumption that the tug has been in fault. The contract requires no more than that he who undertakes to tow shall carry out his undertaking with that degree of caution and skill which prudent navigators usually employ in similar services. But there may be cases in which the result is a safe criterion by which to judge of the character of the act which has caused it." The Burlington, 137 U. S. 386, 11 Sup. Ct. 138; The Isaac H. Tillyer, 41 Fed. 477. The burden of proof is upon the libelant to establish a case of negligence against the tug; but in some cases the facts may constitute a prima facie case of negligence which will impose on the tug the duty of explanation and exoneration. The L. P. Dayton, 120 U. S. 337–351, 7 Sup. Ct.

568; The Webb, 14 Wall. 414. **If a tow is grounded, while in charge of a tug, without any fault of her own, and it was at a place which was known to be dangerous, the burden of proof is on the defense to show that it occurred without negligence or want of skill on the part of the respondent.** The James H. Brewster, 34 Fed. 77; Bouker v. Smith, 40 Fed. 839. "The presumption of negligence originates from the nature of the act, not from the nature of the relations between the parties. It is indulged as a legitimate inference whenever the occurrence is such as, in the ordinary course of things, does not take place when proper care is exercised, and is one for which the defendant is responsible." Transportation Co. v. Downer, 11 Wall. 129.

In this case the tow was grounded while in charge of the tug, and without any fault of the tow. It was at a place which was known to be dangerous to all navigators of Mobile bay who were familiar with the channel, and the east side of the channel was known to the master of the tug to be dangerous, although he may not have known of the danger of the particular place where the tow grounded. The government chart issued in the year 1877, and which was familiar to the master of the tug, showed from 3¼ to 4¾ fathoms of water at this point; but the evidence in the case was that in the last 15 or 18 months the particular shoal had formed there, and that there was now only from four to six feet of water, but that this was well known to the pilots and other regular navigators of Mobile bay. The occurrence was such as, in the ordinary course of things, does not take place when proper care is exercised. There was a departure from the true course when the tug was held off south by east from Sand island, when the mate suggested that they were too close to that beach. The master did not think so, but nevertheless made the departure. It will be borne in mind that the mate knew nothing of the channel, shoals, courses, or currents. It is true, the departure was not great, but I think it was enough to devolve upon the tug the duty of explanation. They say they kept this course but two or three minutes, running from 200 to 400 yards, and then held south again, and in a very short time grounded on the east shoal. At the rate of speed they were going, it could not have been more than thirteen to fifteen minutes from the time they took the departure from Sand Island beach, on the west of the channel, to the time of the grounding on the east shoal, and the channel is shown to be three-quarters of a mile wide. Certainly, there is enough to impose upon the tug the necessity of explaining how she came to be so far off her course in running so short a distance. In order to excuse her, I do not think it must be shown that the accident was inevitable, but it ought to appear that such a deviation from her correct course, and her grounding so soon thereafter, were consistent with cautious and skillful management. The explanation given is that the tide and the current carried the tug and tow to the shoal, and that the master miscalculated in the allowance made for their effect. If the tug held south by east from Sand Island beach for only two or three minutes, running a distance of from two hundred to four hundred yards,—say four hundred yards,—and then turned back south, she was at that time about eight hundred yards from the east side of the channel. Is it likely that in going south a distance of about a mile she could have made such leeway as to have carried her eight hundred yards (half mile) to the east side of the channel? But the evidence tends to prove that the vessel could tell by her compass whether she had sheered or not, and could tell by the Ft. Morgan lights whether the current was carrying her towards the eastward. The master of the tug says as soon as he struck bottom he "got his eye on the compass and light," and saw he was on the east side; that when the tug first took bottom he supposed he had held her up too much, but, when he "put his eye on the compass and light," then he saw how it was, and that he was not where he intended to be, although the chart might have misled the master of the tug, if he had been guided by it at that time. The fact that he did not intend to go where he found himself aground shows that he was not misled by the chart in this instance, and tends to show that he knew what was generally known by other navigators of Mobile bay.

From his undertaking of this towage service, it is to be presumed that he

knew the channel and its difficulties and dangers. The Henry Chapel, 10 Fed. 777; Pettie v. Towboat Co., 1 C. C. A. 314, 49 Fed. 466. If, when the tug struck bottom, the master could tell by looking at the compass and light where he was, and that he was on the east side, why is it he could not have made the same use of the compass and light before he struck bottom, and thus ascertained where he was, and whether the current was carrying him towards the east? Timely use of the compass and lights would, in all probability, have prevented the disaster, and, it seems to me, would have been an act of ordinary prudence. The mate testifies that after they got the ranges, and the master ordered him to hold south, he did not see him again nor receive any instructions from him until the tug struck, and that he (the mate) never noticed the Ft. Morgan lights after he saw he was on the ranges, and steered south; that he did not notice to see whether those lights opened or not. As soon as the tug struck, the master put his eye on his compass and the light, and at once saw that he was out of his correct course. I agree with the master when he says that the only way to account for the disaster is that he must have lost his bearings. He certainly had lost his bearings if, at the time he went ashore, he supposed he was on the west side of the channel, when a look at his compass and the lights showed him he was on the east side. But when and how did he lose his bearings? Was it before the mate suggested to him that they were too close to Sand Island beach? The master did not agree with the mate, but yet directed that he keep off south by east until the Ft. Morgan lights closed on. In this difference of opinion, did no doubt arise as to the true locality, and if so, were there no means at hand to determine the matter? Would soundings have done it? Would sounding not have been an act of ordinary prudence? It seems to me that it would have been. The result has shown that the master was nearer right than the mate, and the circumstances tend to show that when the tug held south by east, on the suggestion of the mate, she was already too far east, or that she held to that course a much longer time than the master and mate supposed she did. How else could she have grounded so soon after bearing south again? Or did the master lose his bearings after steering south by failing to observe his compass and the lights, by which, it seems, he could have told whether he was heading south, was making much leeway, and whether he was on the east or west side of the channel? He knew that it was important to keep well to the westward on account of the wind and current that was prevailing. I think it is apparent that there must have been some mismanagement, or want of adequate care and skill in the management, of the tug. If some unusual cause operated to produce the disaster, a cause against which ordinary prudence was not bound to guard or could not prevent, the evidence, in my opinion, fails to show it. My conclusion is that the libelant is entitled to recover. The case will be sent to a commissioner to assess the damages.

H. Pillans, for appellant.

Gregory L. Smith and H. L. Smith, for appellee.

Before PARDEE and McCORMICK, Circuit Judges.

McCORMICK, Circuit Judge. We have carefully examined the evidence in this case, with the aid of the able brief and oral arguments submitted by the learned proctors, and the well-considered opinion of the judge who heard the case in the district court, and we conclude that the decree appealed from should be affirmed. There is small room for question as to the law applicable to such a case as this. It is settled that a tug is not liable to its tow as an insurer or as a common carrier. The burden is on the libellant to show negligence or unskillfulness in the towage service. In some cases the undisputed circumstances of the disaster may constitute a prima facie case of negligence, and put on the tug the

duty of explanation. The Burlington, 137 U. S. 386, 11 Sup. Ct. 138; The L. P. Dayton, 120 U. S. 337, 7 Sup. Ct. 568; The Webb, 14 Wall. 406.

In this case the tow was being carried from Mobile to Pensacola in the night. The weather was not ugly. The wind was from a westerly direction. There was a strong ebb tide. The state of the tide and wind were such as produced, and were known to produce, a strong current towards the east. Due allowance had to be made for these conditions in running south, which is the chartered course in the channel to a certain point below Sand Island light. The channel abreast of Sand island, which bounds it on the west, is not more—perhaps is a little less—than a mile wide. It was incumbent on the master to watch well the action of the wind and current on the vessel, to hold her up against this action, to guard against drifting, to discover, and seasonably arrest and counteract, the tug's drifting or making too much leeway. The safe track lay close to Sand island; not too close, for there was a shoal on that side as well as on the opposite side. There had been range lights on Sand island, but they had been taken down, and only a single light left. The tug and her tow had passed Sand Island light. The range lights at Ft. Morgan were still visible. The wheelman was steering south,—the customary course. The master of the tug says: "We passed close up to the Sand Island beach, on the west side of the channel,—so much so that the mate, who was at the wheel, said, 'Aren't you too close to this beach?'" to which the master replied, "No, I don't think so. We ought to be close. However, you can keep her off south by east until we get those ranges at Ft. Morgan nearly on." They kept her off south by east a very few minutes, till the range lights were nearly closed on, then resumed the customary course, and in a very few minutes more the tug struck bottom on the east side of the channel. The master was not in the wheelhouse at the time the tug struck on the shoal. The man at the wheel had not seen the captain after he saw the ranges were nearly on, and the tug was put on her south course again.

When the vessel struck, the captain's first impression was that they were on the west side. He went into the wheelhouse, and, he says, got his eye on the compass and light, and saw that he was on the east. In speaking of the occurrence afterwards with the appellee, the captain being asked to explain how it happened, "he sorter shrugged his shoulders, and said: 'I must have lost my bearings is the only way I can account for it.'" The district judge asks, with unanswerable force: "If, when the tug struck bottom, the master could tell, by looking at the compass and light, where he was, and that he was on the east side, why is it he could not have made the same use of the compass and light before he struck bottom?"

We concur with the district judge that a timely use of the compass and lights would have been an act of ordinary care. The master's answer and direction to the mate at the wheel show that he was then in doubt as to his position in the channel. The mate was not acquainted with the harbor, the channel, the shoals, or

the currents. He was an experienced seaman, but had no particular knowledge of these waters. It does not appear that any use of the compass in connection with the lights was made until after the vessel struck bottom. No soundings were made. It is apparent to us, as it was to the district judge, that there must have been some mismanagement or want of adequate care and skill in the navigating of the tug. When the tug struck, the tow drifted on the shoal, could not be got off, became a complete wreck, and a total loss to appellee.

The decree appealed from is affirmed.