THE SARNIA. THE ROBERT PALMER. THE E. T. DALZELL.

(Circuit Court of Appeals, Second Circuit. November 12, 1919.)

No. 7.

1. TOWAGE ⬤⇒4—TUG NOT LIABLE FOR ERRORS OF MASTER IN DOCKING STEAM-SHIP.

A tug, employed to assist in docking a steamship moved under her own steam, is not liable for errors of tug's captain in directing movements of the steamship while on board of her in charge of the operation.

2. COLLISION ⬤⇒116—EFFECT OF BRINGING IN THIRD PARTIES ON LIABILITY OF PETITIONER.

Apart from endeavors to fix secondary liability or responsibility over, the object of admiralty rule 59 (29 Sup. Ct. xlvii) is to bring in parties to answer the exigency of the libel in collision cases, not of the petition, and that allegations of the petition are not sustained affords no ground for holding petitioner liable upon the libel.

3. COLLISION ⬤⇒71(2)—BETWEEN STEAMSHIP AND BARGE MOORED IN SLIP DUE TO FAULT OF STEAMSHIP.

Collision between a steamship being warped into a slip and a barge moored therein *held* due solely to fault of the steamship, in that her engineers failed to obey orders of the tug master in charge of the operation to go astern.

Appeal from the District Court, of the United States for the Eastern District of New York.

Suit in admiralty for collision by the Wright & Cobb Lighterage Company against the steamship Sarnia, the Sarnia Steamship Corporation, claimant, with the tugs Robert Palmer and E. T. Dalzell and their claimants, Richard J. Barrett and Fred B. Dalzell & Co., Incorporated, respectively, impleaded. Decree for libelant against the Sarnia and the Robert Palmer, and their claimants appeal. Modified.

For opinion below, see 251 Fed. 668.

The owners of the steamship Sarnia employed Barrett, owner of the tug Palmer, to take their steamer (in daylight and calm weather) from an anchorage in New York Harbor and dock her on the south side of Pier 4, Brooklyn. In the customary way Barrett (or some agent of his) procured the assistance of another tug (the Dalzell) and Slauer, master of the Palmer, went upon the bridge of the Sarnia and assumed command of the operation. The steamship had her own steam; the two tugs were only to help turn her from the stream into the slip.

At Brooklyn Bridge (a little above Pier 4) the Palmer was on the Sarnia's starboard bow, and the Dalzell on her port quarter, and in these proper positions they remained. Capt. Slauer intended to and did land the port side of the steamer on the southerly corner of Pier 4, putting out the usual bow and spring lines, and winding around the pier edge or corner. The tide was flood, but did not materially affect the maneuver, its force at and near the pier end being slight, if there is not at that point a backset or eddy.

As the Sarnia was 351 feet long, the width of the slip between Piers 4 and 5 only 170 feet, and there were vessels lying on the upper or northerly side of Pier 5, it was plain that considerably less than half the steamer's length could project from Pier 4 as her swing began. When, however, at an angle of about 45 degrees with the face or end of the pier, the Sarnia was permitted to run too much of her length into the slip, and, as she swung, struck (with a glancing blow) libelant's barge lying alongside Pier 5.

Admittedly the Sarnia overreached, and the barge was without fault. The steamer should have checked headway by going astern, and the question

raised here and below is whether the order astern was given too late, or given timely and not obeyed. In the first case, the personal fault would be that of Capt. Slauer, who was navigating and himself handling the telegraph; in the second, that of the Sarnia's engineers.

The District Court held Capt. Slauer, and therefore his tug and her owner, at fault for a variety of reasons, amounting to an accusation of bad navigation, and further declared that the Sarnia, after bringing Barrett and the tugs into the case by petition under rule 59 (29 Sup. Ct. xlvii), had not borne "the burden of proof in support of her petition," and therefore (semble) must share the blame. The Dalzell was discharged. Both Barrett and the Sarnia appealed.

Chauncey I. Clark, of New York City, for appellant Barrett.

Foley & Martin, of New York City (William J. Martin and Geo. V. A. McCloskey, both of New York City, of counsel), for appellee Wright & Cobb Lighterage Co.

Hunt, Hill & Betts, of New York City (George Whitefield Betts and Robert McLeod Jackson, both of New York City, of counsel), for the Sarnia.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). [1] The form of this decree is wrong. The tug Palmer committed no fault, and when Barrett furnished the Sarnia with a pilot in the person of Capt. Slauer, he did not thereby promise a maritime lien on his tug for whatever errors Capt. Slauer might commit while standing on the Sarnia's bridge and managing that steamer with her own steam. The Palmer was as innocent as the Dalzell, and for the same reasons.

[2] Nor is it a reason for holding the Sarnia that she did not bear the burden of proving her own petition; indeed, that would seem more reason for absolving those parties brought in by said petition. Apart from endeavors to fix secondary liability or "responsibility over," the object of the fifty-ninth rule in admiralty is to bring in parties to answer the exigency of the libel, not of the petition; and the sole question in this case is whether on the whole evidence the Sarnia overreached by fault on the bridge, or in the engine room, or both. It is agreed that libelant has complied with the rule of The L. P. Dayton, 120 U. S. 337, 7 Sup. Ct. 568, 30 L. Ed. 669; after that, no question of proof burden is here relevant.

[3] As the Sarnia's bow entered the slip, the pilot, third officer, and a quartermaster were on the bridge, and the first officer on the forecastle head. It is plain that the ship's bow slowly approached the barge's side, until when "20 or 30 feet distant," the first officer "hollered" to the "tugboat captain he was getting close."

But Capt. Slauer testifies that when distant "60 to 75 feet" from the barge he ordered the engines half astern; they went ahead instead, and thereupon he three times rang them full astern before collision, and before the first officer "hollered"; but there was no stern movement until after contact.

The deck log, written by Sarnia's third officer, thus records this performance:

"1:59 p. m. Anchor away slow astern.
"2:03. Stop and half speed ahead.

"2:30.  Stop off end of Pier 4.

"3:15.  Alongside of dock, warping ship into berth, slow speed ahead.

"3:18.  Half speed astern, and then full speed astern.  Telegraph answering astern, but engines going ahead.

"Telegraph run astern three times successively, and answered from engine room, but no change in engines."

Much testimony has been taken in the endeavor to show that this story from the bridge, in the making of which record Slauer had no hand, is untrue.  It is certainly not refuted by the engine room, whose methods are open to criticism, into the details of which we do not think it profitable to go.  We accept the deck's explanation of collision.

It is finally suggested, in support of the result below, that, admitting errors in the engine room, the pilot's order astern was too late, and his repetition of signals evidence rather of his own trepidation than persistent disregard by the engineers of orders given.  This explanation lacks testimony to support it, and does require belief in an agreement between Capt. Slauer and the third officer of the Sarnia (a stranger to him) to falsify the deck log—not to speak of the quartermaster.  Such a conspiracy is improbable and unproven.

In our opinion, the sole cause of this collision was the failure of the Sarnia's engineers to obey orders; and the decree appealed from is modified, by dismissing the libel against all parties except the Sarnia, against which vessel Barrett and the libelant will severally recover one bill of costs in this court.