### CENTRAL WHARF TOWBOAT CO. v. FURNISS, WITHY & CO., Limited.

(Circuit Court of Appeals, First Circuit. January 4, 1921.)

No. 1474.

1. **Towage ☞15(2)—Evidence held to show injury to steamer was by negligence of tug docking steamer.**
   Where claimant had contracted to dock libelant's steamers, and furnished a tug and a pilot, who had full charge of the docking operation and directed the movements of the tug, evidence *held* to show that the steamer struck the wharf nearly bow on because of the lack of ordinary care and skill which should have been exercised by the pilot in the use of the tug.

2. **Towage ☞11(1)—Tug liable for failure to exercise reasonable care and skill.**
   While a steam tug is not a common carrier, nor an insurer, it is bound to exercise reasonable skill and care in everything relating to the work, until it is accomplished, and is liable for want of either to the extent of the damage sustained.

3. **Towage ☞11(7)—Tug held liable for negligence of pilot furnished by tug owner and directing docking of steamer by tug.**
   Where claimant, which had contracted to dock libelant's steamers, furnished a tug and a pilot, and at the time of a collision with the wharf the steamer was not under her own steam, but was being docked by the assistance of the tug under direction of the pilot, who had charge of the whole operation of docking, the tug could be held liable for the negligence of the pilot in the use of the tug.

Appeal from the District Court of the United States for the District of Maine; Clarence Hale, Judge.

Suit in admiralty by Furniss, Withy & Co., Limited, against a tug claimed by the Central Wharf Towboat Company. Decree for libelant (The Pejepscot, 217 Fed. 150), and claimant appeals. Affirmed.

Nathan W. Thompson, of Portland, Me., for appellant.

William H. Gulliver, of Portland, Me., for appellee.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

JOHNSON, Circuit Judge. [1] This is an appeal from a final decree in an admiralty case. The appellees made a contract with the appellant to dock its steamers upon their arrival at Portland, Me. The Daltonhall, one of its steamers, arrived at Portland on February 19, 1910, and anchored in the outer harbor, off the quarantine. She was to dock at Maine Central Wharf No. 3, to reach which it was necessary to pass through the draws of two bridges. Her captain went ashore and returned about 11:30 in the forenoon of that day aboard the tug Pejepscot, chartered and controlled by the appellant and in command of Capt. Swett. The appellant sent Capt. McDuffie with the captain of the Pejepscot to take charge of docking the Daltonhall, because of his longer experience in docking vessels at this particular wharf and his more intimate knowledge of the depth of water and the conditions to be encountered there.

It was a cold day, and when the chief officer attempted to weigh the port anchor of the steamer the windlass became unlocked because of the ice upon it, and the chain ran out until it was stopped by the compressor. After two attempts, he announced to the bridge that the anchor was "aweigh," and under Capt. McDuffie's order the steamer's engines were started "slow ahead" to hold her up to the wind, until the mate reported to the bridge that the anchor was "up." The engines then were started "half speed ahead," with the Pejepscot fast to the starboard side of the steamer, and both Capt. Anderson of the steamer and Capt. McDuffie were upon her bridge, and remained there constantly until the vessel was docked.

Immediately after passing through the draw of the second bridge it was necessary to turn the steamer sharply from a westerly to a north-northeasterly course. This was done by use of her own engines, with the assistance of the tug, and when she approached the wharf, in turning, her port anchor, whose shank had not been fully drawn up into the hawse pipe, collided with the cap log of the wharf and the hawse pipe was broken. This libel was brought to recover for the damage so sustained through the negligence, as it was claimed, of Capt. McDuffie, in charge of the tug and the docking of the steamer.

The contention of the appellant was that the steamer was negligent because its chief officer did not properly stow its anchor, but left it extending farther from the side of the bow than it would have extended if the shank of the anchor had been fully drawn into the hawse pipe, and that its position was unknown to Capt. McDuffie or the master of the tug, and also that, if Capt. McDuffie was negligent, the appellant was not liable for his negligence, although it admitted he had the sole charge of her docking.

Upon the question whether Capt. McDuffie knew the position in which the anchor was left or not, the testimony was conflicting. The chief officer of the steamer testified that, after he had reported "the anchor is up," he found difficulty in getting the shank of the anchor fully into the hawse pipe, so that its flukes would lie closely against the bow; that after he had been employed about 10 minutes in trying to get the anchor into this position, and had been unsuccessful, he was ordered by the captain of the steamer to leave it where it was.

The captain of the steamer testified that Capt. McDuffie said to him:

" 'Is the anchor up?' He says, 'Keep the anchor where it is.' He said, 'We may want it; keep the anchors handy, we may want them.' So I hollered out to the chief officer and said, 'Never· mind that anchor;' I said, 'We may require them.' "

The pilot denied that this conversation was had, or that he knew the shank of the anchor had not been fully drawn up into the hawse pipe. But, in view of the difficulty that the chief officer had been having in stowing the anchor, and that he had spent about 10 minutes in attempting to get its shank fully into the hawse pipe, and while doing this he was in full view of Capt. McDuffie, we think it more probable that such conversation occurred, and that Capt. McDuffie, from his long experience, knew that the anchor was not drawn up into the hawse pipe, so that its flukes would lie close against the bow of the steamer.

It was claimed by the appellant that the damage to the hawse pipe was caused by the anchor coming in contact with the cap log of the wharf as the steamer was being drawn alongside the wharf and nearly parallel to it, toward her berth, by means of a bowline operated by her own windlass.

The captain and the chief officer of the steamer, and also a stevedore who stood upon the wharf, testified that the anchor came in contact with the cap log of the wharf when the steamer was approaching it at an angle of from 40 to 45 degrees. The Daltonhall had a very bluff bow, and it is evident that she must have approached the wharf at about this angle to permit the anchor to come in contact with it. When the accident occurred, the Pejepscot was upon her starboard stern, pushing that toward the wharf. The chief officer testified that the bowline had not then been secured to the wharf, nor had the windlass been used to wind the steamer ahead; that a spring line had been thrown out, which had been made fast to the wharf, but the engines of the steamer had been stopped, and when the bowline was secured it was the intention to wind the steamer ahead by use of the windlass.

Stevedore Burns stood upon the wharf at this time, and he testified orally, so that the District Court had an opportunity to judge of his credibility. He was standing upon the wharf, he said, when the steamer approached it at an angle of about 40 degrees, and, seeing that the steamer would strike the wharf, he feared it would tear it up, and he might suffer some injury, and he stepped back to be out of the way.

We think, as did the District Court, that the accident must have happened by the steamer striking the wharf as she approached it at an angle of about 40 degrees, and we think, also, that her stern was then being pushed toward the wharf by the tug, which gave her a forward movement also.

It was not contradicted that the chief officer of the Daltonhall, who was standing on her bow, notified the pilot when the steamer was within 30 feet of the wharf, and that he replied, "All right;" but, instead of stopping her, as might have been done at that distance from the wharf, and when she was moving very slowly, or should have been moving slowly, if proper care had been exercised, and the tug was upon

her starboard quarter, she was allowed to forge ahead and strike the wharf. The steamer's engines were stopped at the time, and we think the accident happened because the Pejepscot, in attempting to push her stern around, imparted a forward movement to the steamer. Capt. McDuffie claimed that he did not know that the wharf had been struck, but testified that, as they approached the wharf, a man came out of the forecastle in an excited manner, and that Capt. Anderson of the steamer asked him what the man said, and that he replied:

"'I don't know; do you?' He says, 'She must have done some damage up forward there when she touched the wharf.' I says, 'When did she touch? I don't know it.'"

His attention was afterward directed to the testimony of Capt. Anderson, in which that officer stated that he felt the shock when the steamer hit the wharf, and that he called the pilot's attention to the man who rushed out of the forecastle, and asked the pilot what he said, as he didn't catch it, and that the pilot replied:

"'Oh,' he says, 'there can't be anything broken,' he said; 'We haven't touched hard enough.'"

And Capt. McDuffie admitted that he made this statement.

It was in evidence that Capt. McDuffie went out upon the wharf after the steamer was docked and looked at her bow to see what damage had been done. He himself testified that he did this, and that then he examined the scar which had been made on the cap log by the anchor striking it. There does not seem to have been any reason why Capt. McDuffie should have made his examination, if he was not aware that the steamer had struck the wharf.

In answer to the question, "Then why did you get out onto the wharf and make inquiries?" he replied:

"Because the captain asked me, and referred the accident to me. He said that we must have done some damage to the wharf, and I asked him, 'How and when?' He said, 'When she came bow on;' I said, 'When she came bow on?' Q. Go on. A. He says, 'While the tug was shifting.' I says, 'She went off 48 feet from the wharf; they wouldn't allow her to go bow on to the wharf.'"

Capt. McDuffie, who gave his testimony orally, testified that it would not have been good seamanship to allow the steamer to go bow on to the wharf. He was upon the bridge of the steamer, and had full charge of the whole operation of docking, and directed the movements of the tug.

[2] We are convinced from the testimony, as was the District Court, that the steamer did strike the wharf nearly bow on, because of the lack of the ordinary care and skill which should have been exercised by Capt. McDuffie in the use of the tug under the circumstances.

While a steam tug is "not a common carrier nor an insurer," it "is bound to exercise reasonable skill and care in everything relating to the work until it is accomplished, and she is liable for want of either to the extent of the damage sustained." The Margaret, 94 U. S. 494, 24 L. Ed. 146.

[3] But, if Capt. McDuffie did not exercise the ordinary care which he should have exercised under the circumstances, it is claimed by the

appellant that it is not liable for any errors committed by him, and cites in support The Sarnia (C. C. A.) 261 Fed. 900. But in that case the pilot, who was aboard the Sarnia, and on her bridge at the time of a collision, was managing that steamer under her own steam: while in this case the Daltonhall, at the time of the accident, was not proceeding under her own steam, but was being docked by the assistance of the tug, under direction of Capt. McDuffie. In the Sarnia the court said:

"The tug Palmer committed no fault, and when Barrett furnished the Sarnia with a pilot in the person of Capt. Slauer, he did not thereby promise a maritime lien on his tug for whatever errors Capt. Slauer might commit while standing on the Sarnia's bridge and managing that steamer with her own steam."

In the case of the Daltonhall, however, Capt. McDuffie had charge of the whole operation of docking her, and he was not acting as her pilot in managing her under her own steam at the time the accident occurred; but by his orders the tug Pejepscot was attempting to swing the stern of the Daltonhall in to the wharf. He also gave directions about putting out lines to the wharf; but, when the accident occurred, the movement of the steamer toward the dock was being effected solely by the use of the tug, and we think that the finding of the District Court was right that the tug must be held solely at fault.

The decree of the District Court is affirmed, with cost to the appellee in this court.