## THE J. P. DONALDSON.

**CERTIFICATE FROM THE COURT OF APPEALS FOR THE SIXTH CIRCUIT.**

No. 29. Argued April 1, 1896. — Decided May 24, 1897.

No contribution in general average can be had against a steam tug for the casting off and abandonment, by her master, of her tow of barges, with the intention and the effect of saving the tug.

THE case is stated in the opinion.

*Mr. F. S. Masten* for appellant.

*Mr. Harvey D. Goulder* filed a brief for appellant, upon which were also *Mr. Francis J. Wing* and *Mr. S. Holding.*

*Mr. Frank H. Canfield* for appellee. *Mr. George L. Canfield* was on his brief.

MR. JUSTICE GRAY delivered the opinion of the court.

Two libels in admiralty in the District Court of the United States for the Eastern District of Michigan, against the propeller J. P. Donaldson, by the owners of the barges Eldorado and George W. Wesley, for the loss of the barges, having been consolidated and dismissed in that court; and its decree having been reversed by the Circuit Court upon the ground that the libellants were entitled to recover against the propeller for the loss of the barges as a general average contribution, and a decree accordingly having been rendered for the libellants; and the causes having been taken by appeal from the Circuit Court to the Circuit Court of Appeals; that court, desiring the instruction of this court as to the right of the owners of the barges to recover against the propeller upon the principles of general average contribution, certified to this court the question whether they could so recover upon the following facts:

"The J. P. Donaldson was towing the said barges Eldorado and George W. Wesley from Buffalo, New York, to Bay City, Michigan, having no other connection with them than that she was to tow them, and to receive for her services a portion of freight which the said barges would earn on the trip, according to the custom and usage which prevails upon the Great Lakes. By a violent storm, and without negligence on the part of the J. P. Donaldson, she, with her tow, were driven on a lee shore, and all were in imminent, if not certain, peril of being blown ashore and lost. The J. P. Donaldson strug-

gled against the storm to the last moment she could with safety to herself; and then, in order to prevent her from going ashore and being lost, her master, after first giving notice with her steam whistle of his intention to do so, and without negligence on his part, cut the tow-line connecting said barges to her, and the said barges were driven on shore and were wrecked and lost, and the J. P. Donaldson, by reason of being thus disencumbered of her tow, was enabled to reach a port of safety."

By the order of that court there were transmitted to this court, together with the above certificate, copies of the pleadings and decrees, and of the opinions of the District and Circuit Courts, reported in 19 Fed. Rep. 264, and 21 Fed. Rep. 671.

This case presents a novel question in the law of general average, which, briefly stated, is whether a contribution in general average can be had against a steam tug for the casting off and abandonment, by her master, of her tow of barges, with the intention, and with the effect, of saving the tug.

The decision of this court in the recent case of *Ralli* v. *Troop*, 157 U. S. 386, and the reasons upon which that decision was based, go far towards determining this question.

In that case, upon full review of the authorities, it was held that the right of contribution in general average, whether considered as resting upon natural justice, or upon implied contract, or upon a rule of the maritime law, known to and binding upon all owners of ships and cargoes, could only arise out of the exercise of the power of the master, or of one occupying his place, as the agent by necessity of the owners of ship and cargo, and charged by law with the duty, in case of emergency, of sacrificing part of the property for the safety of the rest. This court there said: "Whether the master is considered as acting under an implied contract between the owners of the vessel and the shippers of the cargo, or as the agent of all from the necessity of the case, or as exercising a power and duty imposed upon him by the law as incident to his office — whatever may be considered the source of his authority — the power and the duty of determining what part of the common adventure shall be sacrificed for the safety of

the rest, and when and how the sacrifice shall be made, appertain to the master of the vessel, *magister navis*, as the person entrusted with the command and safety of the common adventure, and of all the interests comprised therein, for the benefit of all concerned, or to some one who, by the maritime law, acts under him, or succeeds to his authority." 157 U. S. 400. "There can be no general average, unless there has been a voluntary and successful sacrifice of part of the maritime adventure, made for the benefit of the whole adventure, and for no other purpose, and by order of the owners of all the interests included in the common adventure, or the authorized representative of all of them. The safety of any property, on land or water, not included in that adventure, can neither be an object of the sacrifice, nor a subject of the contribution." 157 U. S. 403. It was likewise shown that by the general law, unless modified by local statute or custom, the right of contribution is limited to the particular ship and cargo, and the sacrifice of one ship for the safety of another does not give rise to any claim of general average. 157 U. S. 404, 406, 408.

The question then is whether the steam tug and her tow of barges were so connected by the contract of towage, as to make the tug and the tow, while navigated under and in accordance with that contract, a single maritime adventure; to entrust the master of the tug with the authority, in case of unforeseen emergency, of sacrificing any of the barges, or the whole or part of the cargo of any of them, for the safety of the rest of the barges and their cargoes, or of the tug, or of her cargo, if any; and, if such safety is thereby secured, to give the owners of the interest sacrificed a right of contribution in general average against the interests saved, or their owners.

While the tug is performing her contract of towing the barges, they may indeed be regarded as part of herself, in the sense that her master is bound to use due care to provide for their safety as well as her own, and to avoid collision, either of them or of herself, with other vessels. *The Syracuse*, 9 Wall. 672, 675, 676; *The Civilta*, 103 U. S. 699, 701.

But the barges in tow are by no means put under the control of the master of the tug to the same extent as the tug herself, and the cargo, if any, on board of her.

A general ship carrying goods for hire, whether employed in internal, in coasting or in foreign commerce, is a common carrier; and the ship and her owners, in the absence of a valid agreement to the contrary, are liable to the owners of the goods carried as insurers against all losses, excepting only such irresistible causes as the act of God and public enemies. *Liverpool Steam Co.* v. *Phenix Ins. Co.*, 129 U. S. 397, 437. But a tug and her owners are subject to no such liability to the owners of the vessels towed, or of the cargoes on board of them. The owners of those vessels or cargoes cannot maintain any action for the loss of either against the tug or her owners, without proving negligence on her part. As was said by Mr. Justice Strong, and repeated by the present Chief Justice, "An engagement to tow does not impose either an obligation to insure, or the liability of common carriers. The burden is always upon him who alleges the breach of such a contract to show either that there has been no attempt at performance, or that there has been negligence or unskilfulness to his injury in the performance. Unlike the case of common carriers, damage sustained by the tow does not ordinarily raise a presumption that the tug has been in fault. The contract requires no more than that he who undertakes to tow shall carry out his undertaking with that degree of caution and skill which prudent navigators usually employ in similar services." *The Webb*, 14 Wall. 406, 414; *The Burlington*, 137 U. S. 386, 391. See also *The L. P. Dayton*, 120 U. S. 337, 351.

The master of a vessel is appointed by her owners, and is their agent, and they are responsible for injuries caused to third persons by his negligence in navigating the vessel. The master of the tug is appointed by and is the agent of the owners of the tug; he is not appointed by the owners of the vessels towed; and if, by mismanagement of the tug, without any negligence on the part of the tow, the tow is brought into collision with another vessel, the tug and not

the tow is responsible. *The John Fraser*, 21 How. 184; *The Hector*, 24 How. 110. As was said by this court in *The Hector:* "By employing a tug to transport their vessel from one point to another, the owners of the tow do not necessarily constitute the master and crew of the tug their agents in performing the service. They neither appoint the master of the tug, nor ship the crew; nor can they displace either the one or the other. Their contract for the service, even though it was negotiated with the master, is, in legal contemplation, made with the owners of the vessel, and the master of the tug, notwithstanding the contract was negotiated with him, continues to be the agent of the owners of his vessel, and they are responsible for his acts in her navigation." 24 How. 123.

In *Transportation Line* v. *Hope*, 95 U. S. 297, in which the owner of a barge maintained an action against the owner of a tug for negligence of the master of the tug, by which the barge was totally lost, this court, while holding that the tug "had the supreme control of the barge, so far as it was necessary to enable it to fulfil its contract to tow the barge," recognized that the tug "did not occupy the position of a common carrier, and did not have that exclusive control of the barge which that relation would imply; it did not employ or pay the master and the men in charge of her; nor did it exercise that internal control of her cargo, its storage, its protection, and the like, which belonged to a bailee." 95 U. S. 300.

It is solely for the purpose of performing the contract of towage, that the vessels towed are put under the control and management of the master of the tug. In all other respects, and for all other purposes, they remain under the control of their respective masters; and, in case of unforeseen emergency, it is upon the master of each that the duty rests of determining what shall be done for the safety of his vessel and of her cargo. If the question arises whether it is safer for one of the barges to continue in tow, or to cut loose and anchor, the decision of that question ultimately belongs to her own master, and not to the master of the tug. And if the question presented is either whether the barge should be run

ashore for the purpose of saving her cargo, or else whether a part or the whole of the cargo of the barge should be sacrificed in order to save the rest of her cargo, or the barge herself, the decision of the question whether such stranding or jettison should or should not be made is within the exclusive control of the master of the particular barge, and in no degree under the control of the master of the tug; and, in either case, any right of contribution in general average cannot extend beyond that barge and her cargo.

The suggestion of the counsel for the libellants, that the barges had no means of self-propulsion and were powerless for any purpose of navigation, is unsupported by the statement of facts in the certificate of the Circuit Court of Appeals, and is inconsistent with the allegations of the libellants themselves. Each of the libels alleged that the barge was "in every respect well manned, tackled, apparelled and appointed." One of the libels alleged that the George W. Wesley was a schooner barge, and on the night before the loss "carried her mainsail, foresail and staysail," and that early in the morning "said sails were taken in," because "the sails would not draw in the course that they were then running." And the other libel alleged that on the day after the loss the master and crew of the Eldorado returned on board of her, and proceeded to strip the wreck "and save from it all that could be saved of her sails, rigging, etc." And each answer alleged that after the storm began the master of the tug signalled the barges "to make sail and get their anchors ready."

The master of the tug, having no authority to decide, as between a barge and her cargo, what part shall be sacrificed for the safety of the rest, and thereby to subject what is saved to contribute in general average for what is lost, can surely have no greater authority, by abandoning all the barges with their cargoes, to subject the tug to a general average contribution.

The fact that the sum to be paid to the tug for towing each barge was measured by a certain proportion of the freight to be earned by that barge is immaterial. It did not create a partnership between the owners of the tug and the owners of

the barges.  *Meehan* v. *Valentine*, 145 U. S. 611.  Nor could
it have the effect. of combining the tug and the barges into a
single maritime adventure, within the scope of the law of
general average.

For the reasons above stated, this court concurs in the
opinion expressed in this case by Mr. Justice Brown, when
District Judge, that " the law of general average is confined
to those cases wherein a voluntary sacrifice is made of some
portion of the ship or cargo for the benefit of the residue,
and that it has no application to a contract of towage."   19
Fed. Rep. 272.

*Question certified answered in the negative.*

Mr. Justice Brown took no part in this decision.