## THE LASSELL.

(District Court, E. D. Pennsylvania. January 17, 1912.)

### No. 19.

**1. MARITIME LIENS (§ 9*)—SERVICES RENDERED TO STRANDED VESSEL.**

Services rendered in lightering, floating, and reloading a stranded ship which had just started on her voyage, although under a contract made by one of her owners, are in the nature of salvage services, and the one rendering them is entitled to a maritime lien therefor in the absence of an express agreement to the contrary.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 13; Dec. Dig. § 9.*]

**2. ADMIRALTY (§ 33*)—JURISDICTION—SUIT PREMATURELY BROUGHT.**

A suit in rem may be maintained for services rendered to a stranded vessel by lightering, floating, and reloading her, although begun before the reloading has been fully completed, where special circumstances justify the proceeding, as where the vessel is about to proceed out of the jurisdiction without paying or securing the claim.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 313–315; Dec. Dig. § 33.*]

In Admiralty. Suit by the Independent Pier Company against the steamship Lassell; McCaldin Brothers, claimants. Decree for libelant.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

George P. Rich, for libelant.
Howard M. Long, for respondent.

J. B. McPHERSON, District Judge. Early in the morning of Tuesday, March 15, 1910, the American steamship Lassell, having completed the first few miles of a voyage from Philadelphia to New Orleans, stranded upon an island in the Delaware river. She was not heavily loaded, but she ran so hard aground that two tugs, aided by the ship's own power, could not release her, although the effort was made at once and at the proper stage of the tide. Her home port was New York, where her owners, Joseph and James McCaldin, lived and for many years had been engaged in marine affairs; but as it happened James was then in Philadelphia. He went to the ship later in the day and discussed the situation with the master. She was under charter to the Philadelphia & Gulf Line Steamship Company, and as the charter party suspended the hire after a delay of 24 hours it was of much importance to the owners that she should proceed as soon as possible. It was finally decided that the cargo must be lightered, and that the work should begin at once and be prosecuted day and night, so that the voyage might be resumed at the earliest moment possible. Thereupon the master and James McCaldin returned to Philadelphia, and early in the evening employed the Independent Pier Company to do the work. Within a few hours a large force of men was collected and was transported to the ship. A tug, a steam barge, and two lighters were provided, arrangements for feeding the men were made, and the work was begun and continued diligently and without intermission. The necessary shifts of laborers were hired, and the men were carried backward and forward between the city and the ship. At the high tides on Wednesday the tug pulled upon the vessel without avail, but about 5 a. m. on Thursday the third effort was successful. About 700 tons—a large proportion of the cargo and of the bunker coal—had been taken out of her, and in that condition she returned at once to Philadelphia, accompanied by the tug and the loaded lighters. She was there surveyed immediately and was found to be practically uninjured; the bottom having fortunately been soft. The libelant was ordered to replace the cargo and the coal without delay, and this work was done promptly, so that the ship was ready to resume her voyage some time before midnight of Thursday. It had been McCaldin's intention that she should sail very early on Friday morning at the latest, but at 7 o'clock on Thursday evening the marshal seized her under the present libel, and she did not enter security until some time on the following day. Three defenses are now presented: (1) That an action in rem cannot be maintained because the contract between the parties was made by an owner upon his personal credit; (2) that the suit was prematurely brought before the work of reloading had been finished; and (3) that in any event the charge is excessive.

[1] 1. It will be observed that this is not a case of ordinary repairs and supplies furnished in a foreign port. The ship had stranded, and the whole of the libelant's claim is based on what was done in

lightering, floating, and reloading. It was a general average service, and was so regarded by the master and by James McCaldin. No other evidence is needed than the fact that a general average adjustment was made during the summer of 1910, at the instance of the McCaldin brothers, in which they claimed and were allowed credit for the full amount of the bill now in dispute ($1,931), and were also allowed commissions for actually disbursing that sum among other expenses caused by the stranding. But, irrespective of this fact, it is clear I think that (in the absence of a special agreement to the contrary) the services were such as entitled the libelant to a maritime lien. It is not necessary to discuss the elements that must be present before such a claim can be successfully made. The subject of general average was elaborately considered in Ralli v. Troop, 157 U. S. 394, 419, 15 Sup. Ct. 657, 670 (39 L. Ed. 742), and some of the court's conclusions are thus stated:

"To constitute a general average loss, there must be a voluntary sacrifice of part of a maritime adventure, for the purpose, and with the effect, of saving the other parts of the adventure from an imminent peril impending over the whole.

"The interests so saved must be the sole object of the sacrifice, and those interests only can be required to contribute to the loss. * * *

"As the sacrifice must be for the benefit of the common adventure, and of that adventure only, so it must be made by some one specially charged with the control and the safety of that adventure, and not be caused by the compulsory act of others, whether private persons or public authorities.

"The sacrifice, therefore, whether of ship or of cargo, must be by the will and act of its owner, or of the master of the ship, or other person charged with the control and protection of the common adventure, and representing and acting for all the interests included in that adventure, and those interests only."

See, also, The Donaldson, 167 U. S. 601, 17 Sup. Ct. 951, 42 L. Ed. 292, and The Irrawaddy, 171 U. S. 189, 18 Sup. Ct. 831, 43 L. Ed. 130. All these elements were present here in some degree. It is true that the situation was not extremely dangerous, that the services were not perilous, and that the degree of merit to be ascribed to the libelant is not unusual; but the fundamental fact is that the ship could not "get on"—to use Mr. Justice Johnson's phrase in The St. Jago, 22 U. S. 409, 6 L. Ed. 122. Her usefulness was temporarily at an end; unless she could be released, she must cease to be a ship and become potentially a wreck. It was therefore in the nature of a salvage service to float her, however low in the scale the services now in dispute may be ranked, and in my opinion it is clear that for such a service a maritime lien exists and may be enforced by an action in rem. If authority is desired, it may be found in the forcible reasoning of Judge Gray of this circuit in The Alligator, 161 Fed. 39, 88 C. C. A. 203, although the subject specially considered is repairs and supplies:

"This law (the general admiralty law, as administered in the United States) imposes upon a vessel, as a consequence of certain situations and conditions, when established by evidence, the peculiar lien known as a maritime lien. Owing to the underlying necessities of commerce, and to the wandering character of its great instrument, a ship, courts of admiralty

will infer, in the absence of proof to the contrary, that, where supplies necessary for the accomplishment of the ship's voyage are furnished in a foreign port on the order of the captain of a ship, or the ship's agent, and even under some circumstances by the owner, they are furnished on the credit of the ship, and a lien for their value attaches by operation of law. In other words, these facts and conditions, being proved, are held ground for the reasonable presumption of credit to the ship and a consequent lien. The same presumption is held to arise as to certain maritime services rendered to a ship, independently of its character as domestic or foreign.

"The lien, to which the ship is thus subjected, is created, not so much for the benefit of the creditor, but for the benefit of commerce. Merchants and others are thereby encouraged to furnish supplies and render services necessary to the continuance of the ship's voyage and to the commercial enterprise of which she is the instrument. In the United States, at least, these reasons for creating a lien in the absence of express contract, in judicial contemplation cease to exist in the home port and with reference to a domestic vessel. The presumption, or rather the burden of proof, in such cases, therefore, is shifted, and when supplies are furnished to such a vessel, the burden is upon the furnisher to show a mutual understanding that they were furnished on the credit of the vessel. As already observed, there are maritime services which are usually rendered under circumstances which make them so essential to the movement of a vessel, and to the performance of her primary function, as an instrument of commerce, that the admiralty law presumes they are rendered on the credit of the vessel, in the absence of proof to the contrary, and creates a maritime lien in their favor, independently of the question whether it be a domestic vessel or not. Notable examples are the lien for pilotage services, the lien for seamen's wages, for towage services, and for salvage services. The reasons for the rule in these cases are obvious, and arise out of the necessities of the situation. It would be an obstruction to commerce, as well as unreasonable, if a sailor were required to show a mutual understanding between himself and the captain that there should be a lien upon the vessel for his wages, or that the pilot who goes over the ship's side as she approaches a port, or in a dangerous channel, should be called upon to show a like mutual understanding. So, in the case of salvage, much of the world's wealth would be put in jeopardy, if the salvor could only claim a lien on the property saved, by showing a mutual understanding to that effect before the service was undertaken. The peculiar exigency of the situation in all these cases supplies the reason for the rule of presumption of lien, as it has been long recognized in the administration of the general admiralty law."

See, also, The Garonne, 160 Fed. 847, 87 C. C. A. 651. As it seems to me, therefore, if there were no evidence in the present case concerning a contract between James McCaldin and the Pier Company, the presumption would be in favor of a lien, and if the right should be denied the owner would be bound to show by satisfactory evidence that the services were rendered on his personal credit. But there is evidence upon the subject; and in my opinion, even if this were a contract merely for repairs and supplies, it would require me to hold that the contract was made on the credit of the ship. I have read the mass of testimony that has been taken, and (if the fact should be important) I find that the libelant declined to undertake the work except on the credit of the ship, and that McCaldin accepted the condition. The contract was not made on James McCaldin's personal credit, or on the credit of his firm.

[2] 2. No doubt the libel was filed prematurely; that is, before all the work was done. Reloading was not finished for several hours after the suit was brought, and perhaps not before the marshal took

possession. The reason for this haste is apparent. The Pier Company was in doubt whether its bill would be paid promptly, and was insisting, as it had a right to insist, on payment or security. So far as appears, James McCaldin made no offer to pay; but he did make an effort to obtain such security as the Pier Company would accept. He was not successful, and Thursday afternoon passed away in fruitless negotiation. It is clear that McCaldin had ordered the ship to sail as soon as she could get away, and he intended that she should go, whether or not he could obtain security for the libelant's bill. Under the circumstances, therefore, I think the Pier Company was justified in bringing suit and putting the marshal in charge. The libel stated the claim as accurately as could then be done, and it was amended next day after the work had been finished and the exact amount could be ascertained. It is settled that a suit may sometimes be brought in admiralty before the cause of action accrues, and the prematureness of the proceeding will only affect the question of costs. The Pioneer (D. C.) 53 Fed. 279; Clark v. Lumber, 70 Fed. 1020, 17 C. C. A. 555; The Ella (D. C.) 84 Fed. 494.

3. The remaining question concerns the amount of the bill. This presents a question of fact, and the testimony requires a finding in favor of the libelant. There was no special agreement as to the amount to be charged, and there seems to be little in dispute except the item of $225 for the tug. This is at the rate of $75 for each tide; and, considering all the services rendered by the tug, and the fact that she was apparently required to be in attendance all the time, the rate is not excessive. The ship paid and was allowed $50 for one of the tugs that made an unsuccessful effort to release the vessel before the Pier Company began operations.

A decree may be entered for the libelant's bill with interest and costs. I am unable to see that the ship was improperly injured by the prematureness of the suit.