## THE THOMAS J. CLEAVER.
## THE MARY C. McNALLY.

**LYNCH et al. v. McNALLY et al.**

No. 4509.

Circuit Court of Appeals, Third Circuit.

Oct. 13, 1931.

Rehearing Denied Nov. 28, 1931.

Acker, Manning & Brown, of Philadelphia, Pa. (J. T. Manning, Jr., and S. B. Fortenbaugh, Jr., both of Philadelphia, Pa., of counsel), for appellants.

Biddle, Paul, Dawson & Yocum, of Philadelphia, Pa. (Howard H. Yocum and James M. West, 3d, both of Philadelphia, Pa., of counsel), for appellees.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge.

This is an appeal from an interlocutory decree entered in the District Court of the United States for the Eastern District of Pennsylvania, sustaining in part and dismissing in part a libel in admiralty. The libel was filed by the appellants to recover damages for injuries to the barge Thomas J. Cleaver, and to her cargo, which were occasioned by a collision between the barge and a drawbridge, while the barge was being towed by the tug Mary C. McNally, and by her subsequent sinking.

The steam tug McNally was towing two barges, the Cleaver and the Rita Dempsey from Sparrows Point, Md., to Laurel, Del. On this voyage, the tug proceeded up the Nanticoke river in Maryland with the barges lashed on either side of her. Before reaching the Baltimore, Chesapeake & Atlantic Railroad Bridge which crosses the river at Vienna, Md., the tug dropped the barges astern and lashed them together, side by side; the Cleaver being on the port side. She resumed her journey up the river toward the starboard draw of the bridge, towing the barges on hawsers 12 to 15 fathoms in length and attempted to take them through a draw only 58 feet in width. Their double breadth measured 47 feet 6 inches. This left a clearance of only 5 feet 3 inches on each side of the barges.

When they entered the draw, the Dempsey sheered and her helmsman put her wheel hard to the starboard to avoid hitting an abutment of the bridge. However, her starboard bow struck a piling a glancing blow that caused the Cleaver to be pushed over toward the port, and in consequence her port bow struck a steel caisson with considerable force. Without retarding speed, the tug carried her tow on for a half mile, and then stopped. Captain Lynch of the Cleaver, who has since died, examined his barge, and failed to find any material damage. Captain Har-

rison of the tug asked Captain Lynch to go back to the bridge with him for "a few minutes" and examine it. Lynch went and left the Cleaver at anchor with an inexperienced deck hand on board. The journey to the bridge occupied five minutes, and they remained there, not "a few minutes," but during a period of time variously estimated to be from one-half hour to an hour and a half. As soon as it was noticed by those left in charge of the Dempsey and Cleaver that the Cleaver was settling into the water, the tug, in response to signals, immediately returned and attempted to save her by beaching her on the flats. But she was filling so rapidly that they were unable to prevent her from sinking.

■ The District Court properly found that the master of the tug did not exercise due care in attempting to bring the two barges abreast through the draw in view of the small passage therein and his lack of knowledge of the tidal and stream conditions of the river. He is accordingly liable for the damages resulting from the collision at the bridge. The Margaret, 94 U. S. 494, 24 L. Ed. 146; The J. P. Donaldson, 167 U. S. 599, 17 S. Ct. 951, 42 L. Ed. 292.

But the more important question is whether or not the tug is also liable for the damages resulting from the sinking of the Cleaver. The lower court found that she was not, but that the sinking was due solely to the intervening negligence of her master.

The District Court relied upon two cases as authority for the conclusion that the proximate cause of the sinking was the negligence of her master in leaving her and going back to the bridge with the tug.

The first of those cases is The Mars (D. C.) 9 F.(2d) 183, in which it was held that the intervening negligence on the part of the master was the proximate cause of the sinking, and not the damage done by the collision. In that case the collision caused a hole to be made in the side of the barge some three inches above the water line when the barge was empty, and the following day she was loaded in such a way as to bring her water line below the hole and she sank. The court held the loading to be the proximate cause of her sinking. The hole was obvious and would have been discovered by the most casual examination, but no examination whatever was made and the conclusion of the court was inevitable. The facts in that case were very different from those in the case at bar.

The second case is the Eclipse Lighterage & Transportation Co. v. Cornell Steamboat Co. (C. C. A.) 242 F. 927. There a barge was moored at night along a canal bank. A tug struck the barge such a blow that it awakened her watchman, who was sleeping in her cabin. The watchman got up and, having observed what happened, made only a "casual" examination and then returned to his sleep. He was awakened by shouts the next morning and had only time to escape ashore before she sank. The court held that the tug was liable for the collision, but not for the sinking of the barge, for the reason that the damage which caused the leakage would have been immediately discovered on a proper examination and that the failure to make such examination was the intervening efficient cause which produced the damage.

■ The collision in the instant case was caused by the want of due care on the part of the master of the tug. The tug, being liable for the collision, would also be liable for the subsequent sinking of the barge, if there was no intervening negligence that broke the causal connection between the collision and the sinking.

■ It is urged that the failure of the master of the barge to make a proper examination to discover any damage done to his barge and his subsequent desertion of it to return to the bridge was negligence that caused its sinking.

There is no evidence that the master of the barge failed to make a suitable examination. There is evidence that he made an examination, and, in the absence of anything to the contrary, he is presumed to have fulfilled his duty and to have made an examination that was proper under the circumstances. The Annie Lindsley, 104 U. S. 185, 191, 26 L. Ed. 716; Cincinnati, N. O. & Texas Pacific R. Co. v. Rankin, 241 U. S. 319, 327, 36 S. Ct. 555, 60 L. Ed. 1022, L. R. A. 1917A, 265. There is no evidence of what he did during the half hour between the collision and his leaving the barge to go to the bridge with the captain of the tug, except that he made the examination. We do not know how long that required. Captain Harrison made a "guess" that it was "about five minutes." No one said that Captain Lynch in examining his boat did not sound his wells, go below and fore and aft to make as thorough an examination as the cargo and circumstances permitted. There is every reason to suppose that he did make such an examination. He was part owner of the barge, had the reputation of being a reliable barge mas-

ter and of thoroughly understanding his duties. The burden was upon the appellees to show at the trial that the examination made by the master after the collision was not a proper one, and this they failed to do. Therefore, the presumption stands, and we cannot without evidence penalize the dead master nor his estate for not doing what he is presumed to have done. There is, accordingly, a serious question as to whether or not Captain Lynch was negligent in leaving his barge for a "few minutes" under these circumstances.

■ But if he was negligent in leaving the barge in charge of an inexperienced deck hand and returning to the bridge with the tug, that does not make him liable and relieve the tug wholly or in part unless his negligence became the intervening, efficient cause which itself produced the injury. The captain of a barge, who is shown to be negligent, cannot be made liable for the sinking unless his neg- · lect caused it. The Farragut, 10 Wall. (77 U. S.) 334, 19 L. Ed. 946; The Fannie, 11 Wall. (78 U. S.) 238, 20 L. Ed. 114; The Annie Lindsley, 104 U. S. 185, 191, 26 L. Ed. 716. "Where there is no intermediate efficient cause, the original wrong must be considered as reaching to the effect, and proximate to it." Milwaukee & St. Paul R. Co. v. Kellogg, 94 U. S. 469, 24 L. Ed. 256; Texas & Pacific R. Co. v. Stewart, 228 U. S. 357, 33 S. Ct. 548, 57 L. Ed. 875; Muller v. Globe & Rutgers Fire Insurance Co. (C. C. A.) 246 F. 759, 762; Smith v. Pejepscot Paper Co. (D. C.) 46 F.(2d) 469, 471.

The Cleaver was a wooden barge about 175 feet in length, and, at that time, loaded with a 575-ton cargo of slag. She was thirty-two years old. If she were sprung or injured below her water line (as she in fact was), the damage, unless it were immediately serious, could not have been discovered by any reasonable examination. Because of her age, the seams above the water line would be well dried and she would fill as a sieve if the water rose above that line. It is uncontradicted that the seams and butts on the port and starboard sides of the barge from the bow to a point between the Nos. 1 and 2 hatches had to be "searched" and caulked after she was raised. The barge did not begin to settle so as to be noticed until about an hour and a half after the accident, and she then filled so rapidly that nothing could

be done to save her. The Cleaver was lashed side by side with the Dempsey, whose master and deck hand were both on deck. Any settling of the Cleaver in the water would have been perfectly obvious to them. The captain of the Dempsey said that the Cleaver had settled over a foot when he first noticed it. This, of course, was only a guess, and indicates that, when the settling began, it proceeded fast. The settling was imperceptible until it had proceeded to some, and it may be considerable, extent.

But even if we assume that Captain Lynch was negligent in leaving the barge and that, had he not done so, he would have discovered that she was sinking sooner than did Captain Minnick of the Dempsey, the question arises as to whether or not he could have saved her had he remained on board and done his full duty. The only means available were a pump and a siphon, but the pump was small and able to keep out ordinary seepage only and it required considerable time to rig up the siphon. It had to be hauled on deck, a gasoline pump had to be brought up from below, and a hole cut into the side of the barge in which to fit the siphon. Our conclusions must be based upon competent evidence, and there is no evidence that this could have been done in time to have saved her after the settling had proceeded far enough to be discovered, or that it would have saved her if it had been done. Only five minutes elapsed from the time it was first noticed that the barge was settling until the tug reached her and began to beach her, but she was sinking so fast that she could not be beached and so filled and sank within twenty to thirty minutes in spite of all that could be done. Whether or not the settling would have been sooner discovered if Captain Lynch had remained on the barge, and whether or not, if sooner discovered, she could have been beached and saved from sinking, are guesses and not facts established by evidence. There is, therefore, no evidence showing that the barge could have been saved from sinking had Captain Lynch remained on board.

No intermediate efficient cause, that broke the connection between the collision and sinking of the barge, having been established, the decree of the District Court is affirmed as to its award of damages for the collision, and reversed as to its failure to award damages for the sinking.