## THE DUTTON NO. 6.

## THE DAUNTLESS NO. 7.
### Nos. 13964, 13960.

District Court, E. D. New York.
Sept. 19, 1934.

234

Purdy & Purdy and Edmund F. Lamb, all of New York City, for A. C. Dutton Lumber Corporation.

Otto. & Easterday and H. E. Otto, all of New York City, for Standard Marine Insurance Co., Limited.

Lynch & Hagen and Chas. W. Hagen, all of New York City, for Dauntless Towing Line.

CAMPBELL, District Judge.

The above entitled actions were on stipulation tried together, and as the facts are substantially the same in both cases, one opinion will be sufficient.

The first above entitled action is brought by A. C. Dutton Lumber Corporation, the owner of the lighter Dutton No. 6, to recover for damages alleged to have been caused to said lighter by negligent towage by the tug Dauntless No. 7, and for breach of contract of towage.

The second above entitled action is brought by Standard Marine Insurance Company, Limited, who are subrogated to the rights of A. C. Dutton Lumber Corporation, to recover for damages to cargo.

On conflicting evidence, I find the facts as follows:

On the afternoon of November 28, 1932, the respondent Dauntless Towing Line, Inc., was ordered by the A. C. Dutton Lumber Corporation, the libelant in the first above entitled action, pursuant to agreement theretofore made, to tow the float No. 6 loaded with approximately 500,000 feet of lumber on deck, from Fort Washington Point in the North river to Port Jefferson, Long Island.

The Dutton No. 6 is a converted carfloat 251 feet 2 inches long, 37 feet 4 inches wide, with a very low freeboard when loaded.

She carried a deck cargo of 500,000 board feet of assorted lumber, which was stowed to a height of 14 feet above deck at the bow, and 15 feet at the stern. When loaded, the No. 6 was trimmed somewhat to port and to the stern. The No. 6 had two hatches located about 26 feet from the bow. These hatches were square 24 x 24 inches, and had a small coaming or beading about 1½ inches high. The hatch covers were placed over this coaming, but were not fastened or battened down.

Prior to the trip under discussion, two new deck planks had been installed near the bow of the No. 6. These planks were 21 feet long with a seam of an average width of ⅜ of an inch, which had never been properly caulked.

The Dauntless No. 7 picked up the Dutton No. 6 on the tug's port side.

The Dauntless No. 7 and her tow the Dutton No. 6, with Dominick Tresaloni, her mate, on board, proceeded down the North river and into the East river where Mr. Jackson, the marine superintendent of the A. C. Dutton Lumber Corporation boarded her and she proceeded through the East river and into Long Island Sound, with both of them on board.

The Dauntless No. 7 and her tow proceeded without incident down the North river, through the East river, and into Long Island Sound.

The weather continued favorable for towage.

There was a light northerly breeze 10 to 20 miles per hour, with a slight choppy sea.

The tug and tow proceeded with a fair tide at a speed of 6 to 7 miles per hour.

At about 3 o'clock a. m. November 29, 1932, the mate of the Dutton No. 6, at the instruction of Mr. Jackson, the marine superintendent of the said A. C. Dutton Lumber Corporation, sounded the float and found that she had no water on the starboard side, and only about 2 inches of water on the port side, which was no more than she had at about 1 o'clock a. m., when he sounded her under the Brooklyn Bridge, and could not be reached by the pumps.

Between 4:30 and 5 o'clock a. m., the mate, at the instruction of Mr. Jackson,

again sounded and found a slight increase, amounting to only ½ inch, which could not be pumped out, and which was of such slight moment as not to require immediate attention.

None of these soundings were made forward.

The Dauntless No. 7 was on a course close to the Long Island shore, and the tow was slowed down for several passing steamers, and there is no evidence that any of them passed less than ¼ of a mile off the Dutton No. 6. The Sound steamers Providence, Mohegan, and the Chester Chapin passed the Dauntless No. 7 and her tow somewhere between Throgg's Neck and Execution Light. In that vicinity the Sound varies in width from 1 to 2 miles, the channel, however, is not less than ½ a mile wide, the narrowest place being at Stepping Stones. The Sound steamers St. John, Lexington, and New Hampshire passed the Dauntless No. 7 and her tow between Execution Light and Mattinecock Point. The Sound between those points has an average width of 3 miles, but the channel is at no point less than ½ a mile in width.

Shortly before 6 o'clock a. m., Jackson was awakened by the smacking of water against the cabin window on the port side of the Dutton No. 6. Immediate investigation disclosed that the Dutton No. 6 was half full of water and was severely listed to port.

When at a point off Mattinecock Bay, somewhat west of Captain's Island, those on the Dauntless No. 7 observed the Dutton No. 6 take a sudden list to port, so that her bow rail was almost under water. At that instant the engines of the Dauntless No. 7 were stopped, attention signals were blown, and the mate of the tug rushed over to the Dutton No. 6 to awaken the crew of that vessel.

The two men on the Dutton No. 6 went over on the Dauntless No. 7, and a few minutes after the No. 6 dumped two tiers of lumber over her port side. About fifteen minutes later the No. 6 listed to starboard, very slowly, and dumped cargo from the starboard side. At this time Jackson cut the towing lines with a cleaver, because he felt that it was dangerous for the Dauntless No. 7 to remain alongside. Then the boom of the crane of the No. 6 worked loose and was swinging, and the No. 7 nosed up alongside of the float, and the mate of the tug and Jackson went on board the float to lash the boom, a line was placed on the starboard

bow cleat, and an attempt was made to tow the No. 6 to shore. The No. 6 would not follow the tug and took a sheer and parted a hawser, and at the same time dumped more of her cargo.

The float continued to list from side to side, dumping her cargo at intervals, until 7 o'clock a. m., when she finally turned bottom up.

During all this time the weather was calm. After the float turned over, Jackson and the mate of the Dauntless No. 7 walked on the slippery bottom of the float while securing lines to permit her to be towed.

After the float turned over, the Merritt-Chapman Company were engaged to turn the float over and tow her to dry dock.

The Dutton No. 6 received some damage and the cargo was a total loss.

The Dauntless No. 7 had frequently safely towed the Dutton No. 6 both before and after this disaster, with similar cargoes.

With these facts in mind, let us consider the libelants' contention as alleged in their libels.

They charge, in addition to the usual allegations of incompetence and inattention to duties, that those in charge of the Dauntless No. 7 were at fault:

1. In towing the lighter alongside, and in failing to take her astern on a hawser.

2. In proceeding out into the Sound under unfavorable weather conditions.

3. In towing at excessive speed.

4. In failing to stop when meeting the swells of passing Sound steamers.

5. In continuing to tow the No. 6 with a dangerous list.

6. In failing to have and to use a siphon when the list was noticeable.

■ That the Dutton No. 6 suffered damage, as did also the cargo, is beyond question, but that fact standing alone does not raise any presumption of fault.

The Dauntless and the respondent were not insurers or common carriers.

■ The duty the tug and respondent owed to the tow was to exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service.

■ The burden of proving negligence rested upon the libelants. Stevens v. The White City, 285 U. S. 195, 52 S. Ct. 347, 76 L. Ed. 699; The Maurice R. (D. C.) 3 F. Supp. 86;

see, also, The J. P. Donaldson, 167 U. S. 599, 17 S. Ct. 951, 42 L. Ed. 292; The L. P. Dayton, 120 U. S. 337, 7 S. Ct. 568, 30 L. Ed. 669. The Dauntless No. 7 had frequently towed the Dutton No. 6, both before and after the happening hereinafter described, with similar cargoes, and, so far as the record shows, without any change in the hatch covers.

On all these other occasions the Dutton No. 6 was a good seaworthy boat.

Just previous to this trip, inexperienced employees of the Dutton Lumber Corporation, Inc., installed two planks in the forward deck of the Dutton No. 6. These planks were 21 feet 2 inches in length, and, when examined after the boat turned over, there was no evidence or indication of beveling, no tool marks, and no evidence of oakum, pitch, or tar, or of there ever having been caulking done.

It is true that Miller, under whose supervision the work was done, said he did no caulking but saw men caulking, but he also said that he was not there all the time these planks were being put on, and we must not lose sight of the fact that no men were called who did any caulking nor was their absence accounted for.

I have grave doubts about any caulking having been done with reference to these planks, but in any event, I am convinced that said seams were not properly caulked, and that at least in large portions, if not of all the seams, there was no caulking, and that water, in considerable quantities, found its way into the boat.

The two hatches were about 26 feet aft of the bow and in towing with the No. 6, in a seaworthy condition, she would not be towed with her bow under water sufficiently to allow sufficient water so far back on her deck as to interfere with her hatch covers.

With float tight and alongside the tug, towing the float with her bow under water sufficiently to allow interference with her hatch covers, would have been noticeable to the navigator of the tug, and have interfered materially with her speed.

With water finding its way into the float through the seams, the stability of the No. 6 would be so disturbed, if the free water in the boat went to port, as to cause a list which would uncover the port hatch and submerge that hatch.

The Dutton No. 6 had a 15-inch hog amidships, and, if water entered, it would remain in the bow of the vessel, and would not flow aft to the pumps.

The accumulation of the water would be a gradual process, and as the Dutton No. 6 was not sounded forward of amidships, it would not be readily noticed.

There is no dispute about soundings by the mate at 1 o'clock a. m. when at the Brooklyn Bridge and finding less than 2 inches of water, at 2:55 a. m. amidships on the port side and finding about 2 inches of water, and at 4:45 a. m. and finding about 2½ inches of water amidships and aft, but neither the mate of the No. 6 nor Jackson sounded forward.

Therefore, because of the hog the water would remain in the bow, and as the No. 6 had no longitudinal bulkheads, the free surface of this water would create a dangerous list, and to accomplish this it would not be necessary for the water to enter the hatches, nor for the float to be half full of water before she listed, but the listing of the float far enough to port would put her port bow hatches under water, and water would wash over her stem into the hatchways.

The free surface, not the quantity of water in a boat, causes the list, and had the No. 6 been equipped with longitudinal bulkheads, she might have filled to her rails without losing her stability, but without them, the water being free to run from side to side, her stability was lost.

■ Because of her leaky decks and in conjunction with them her unsecured hatches, the Dutton No. 6 was unfit to navigate Long Island Sound. The Greenwich (C. C. A.) 270 F. 42; Delaware Dredging Co. v. Graham (D. C.) 43 F.(2d) 852; The Radnor (D. C.) 21 F.(2d) 982; The Senator Rice (D. C.) 15 F.(2d) 882, affirmed without opinion (C. C. A.) 15 F.(2d) 883.

With the deck tight, I do not believe there would have been any danger with the hatch covers unbattened, but as they were, under the wind and weather conditions then prevailing and in conjunction with the leaky deck, the condition of the hatch coverings added to the unseaworthiness of the No. 6.

There were two men representing the owner, the libelant A. C. Dutton Lumber Corporation, on board the No. 6, the marine superintendent of that corporation, Jackson, and Tresaloni, the mate of the No. 6.

■■ The floatman or bargee was in charge of the boat and it was his duty to secure the hatch covers if necessary, and not the duty of the tug. No unusual or specially dangerous condition of wind or wave was to be anticipated, and the boat had been in the Sound before, in tow of the same tug, and

the tug, as it was without knowledge of the leaky deck, owed no duty to the tow to advise or require the firmer affixing or battening down of the hatch covers. There was no obvious danger against which the tug might have been required to warn the float.

There was nothing in the prevailing weather conditions which would have deterred any prudent mariner from towing the No. 6 alongside, at the time in question. The wind velocity was between 10 and 20 miles an hour, with a short choppy sea, but not rough. As Jackson, the marine superintendent of A. C. Dutton Lumber Corporation, described it, "There was a mild breeze and a slightly choppy sea." The tug El Chico, towing a Sunoco barge alongside, was only 2 or 2½ miles away when the No. 6 turned over, and Capts. Snyder and Carpenter both said that it would be dangerous and impracticable to tow such a barge alongside in heavy weather.

The Weather Bureaus at New York and Bridgeport recorded wind velocities of 10 to 14 miles from the north and northeast, and their records show that no storm warnings of any sort had been hoisted.

Both Jackson and Thorsen, mate of the Dauntless No. 7, went out on the bottom of the overturned float after the accident to make a line fast for towing, and this certainly tends to show how little sea there must have been in the Sound.

There was no negligence and no fault in the Dauntless No. 7 taking the Dutton No. 6 in tow alongside in the Sound at the time in question, or in towing under the weather conditions.

As in most cases, there is a sharp conflict in the testimony as to the speed of the Dauntless No. 7 and her tow.

The proctors for libelants urge that the speed of the Dauntless No. 7 was 6⅜ miles per hour, from Whitestone to Execution, and about 9 miles per hour thereafter. They base their contention on the claim that the No. 7 with her tow passed Whitestone at about 4 o'clock a. m., and passed Execution at 5 o'clock a. m., traveling a distance as measured on the chart of 6⅜ miles in an hour's time, and that at 5:45 or 5:50 o'clock a. m. the tow was about abreast of Captain's Island, or within about 1,000 feet west of Captain's Island; that the distance from Execution to Captain's Island is 8 miles measured on the chart; that the elapsed time did not exceed 50 minutes, thus making the average speed of the tug at least 9.3 miles per hour.

The evidence does not seem to bear out this calculation. The testimony shows that the Dauntless No. 7 had passed Mattinecock Point and was abreast of Mattinecock and Captain's Island when the tow came into difficulty. She was proceeding on a course close to the Long Island shore, and as soon as she passed Mattinecock Point, she would be approximately abreast of Captain's Island. Mattinecock is 5 miles distant from Execution, and the point of sinking is described at "abreast of Mattinecock and Captain's Island," measured on the chart is 5½ or 6 miles, the elapsed time being 50 minutes. The speed of the Dauntless No. 7 was, therefore, between 6 and 7 miles per hour.

The captain of the steamer Lexington, called as a witness by libelants, testified that he estimated the speed of the Dauntless No. 7 at 6 to 7 miles an hour. The Dauntless No. 7 had a fair tide and was not being run under a full head of steam.

I am convinced that a speed of 7 miles an hour was not excessive, and that if the deck of the Dutton No. 6 had been tight, there would have been no danger to the No. 6 in towing at that speed.

That the Dauntless No. 7 and her tow were passed by the steamers Providence, Mohegan, and Chester Chapin, between Throgg's Neck and Execution, and the steamers St. John, Lexington, and New Hampshire between Execution and Mattinecock, seems to me to be beyond doubt, but there is no evidence as to how close any of them passed the Dauntless No. 7 and her tow, except that the Lexington which, as her captain testified, passed not less than ¼ of a mile off, that he did not slow down or stop his vessel, and that he saw no reason for doing so.

There is no mention in the log of any of the said steamers, offered in evidence, of slowing or stopping for the Dauntless No. 7 and her tow, and no witnesses from any of the steamers, other than Capt. Angell, were called as witnesses.

On such evidence it certainly cannot be said that any of such steamers passed less than ¼ of a mile off the Dauntless No. 7 and her tow.

The widths of the Sound and of the channel, between the points mentioned, are such as to be sufficient to warrant the finding that such steamers, passing ¼ of a mile off the Dauntless No. 7 and her tow, would have little if any effect on the tow of the Dauntless No. 7.

There is no evidence that the Dutton No. 6 was affected by any swells, and there is positive evidence given by the only witness on any of the passing vessels who was called, Capt. Angell, of the Lexington, that he saw no reason for slowing down.

In addition to all of this, there is evidence of those on the Dauntless No. 7 that she did slow down for some steamers. The Dauntless No. 7 and respondent cannot be held liable without proof of negligence. There is no proof that the Dutton No. 6 was affected by any swells, therefore libelants have not borne the burden of showing that the Dutton No. 6 was towed through the swells of a procession of Sound steamers.

The citation of cases relating to swells seems to be unnecessary, as each of them depends upon the particular facts in that case, and there can be no finding of fault or negligence of the Dauntless No. 7, with reference to swells, from passing steamers, in this case.

 It clearly appears from the testimony of those on board the Dauntless No. 7 that not until 5:45 or 5:50 o'clock did any one on the tug discover that the Dutton No. 6 had a list, and at that time the list was very severe, and that there was a large quantity of water in her. This was nine to fourteen minutes after Capt. Angell, of the steamer Lexington, testified he passed the No. 7 and her tow, and that the barge (Dutton No. 6) at that time showed a severe list to port.

This was before the No. 7 passed the St. John or the New Hampshire.

Morgan Moen, the deck hand of the Dauntless No. 7, who had been on the float, came back aboard the No. 7 when the tow got by Execution. There is considerable conflict as to the time when he came back aboard the tug, but it was between 5 o'clock and 5:30 o'clock a. m., and on all the evidence it seems certain that it was nearer 5 o'clock than 5:30 o'clock.

When Moen came aboard the No. 7, he went into the pilot house, and thereafter did the steering. The mate of the No. 7 surrendered the wheel of the tug to Moen, and was either at breakfast or failing to give proper attention to the tow, as he did not observe the list until 5:45 or 5:50 o'clock a. m.

Moen was not at that time a licensed man and should not have been left in charge, but an officer should have been in the pilot house who would give attention to the tow.

The No. 7 with the No. 6 in tow continued on at a speed of 6 to 7 miles per hour, which would not have been dangerous speed unless the tow was listed sufficiently for water to find its way into the float through the hatches; but any appreciable speed was dangerous with a list of that character. Surely if the list was noticeable to Capt. Angell of the steamship Lexington, not less than ¼ of a mile off the Dutton No. 6, it should have been observed by a competent officer of the Dauntless No. 7, and the headway of the boats stopped and measures taken for the safety of the Dutton No. 6.

Failure to timely observe the lighter and take means to correct the condition, instead of continuing ahead at a speed of 6 or 7 miles an hour, was an act of negligence and a fault on the part of the tug Dauntless No. 7.

There can be no doubt that the use of a siphon on the Dutton No. 6 would have been attended with considerable danger after the list was discovered by those on the Dauntless No. 7, and the No. 6 had dumped part of her load, but that does not seem to me to have been the time when a siphon should have been used. I do not believe that the hatch covers were immediately worked off, when the No. 6 took her initial list, but that in listing, with her low freeboard, the No. 6 worked over until the water entered through the hatches, after the hatch covers were washed off.

Had the list been seasonably observed, a siphon could have been used, and the No. 6 freed from water.

 That the wrecking pump 10 x 15 inches in diameter, with an 8-inch suction, would have been more than a substitute for a siphon, goes without saying, but the trouble was that there was no connection hooked up, to use on the boat, and the pump was not seasonably used. While it is true that a letter which merely solicits business is not admissible, it seems to me that the letter of October 8, 1932, was made a part of the towage contract, and that by that contract the Dauntless No. 7 was required to be equipped with a siphon, but the wrecking pump hereinbefore described was more than a sufficient substitute for the siphon, if properly connected up for use.

The fault was in failing to have the pump connected up ready for use, and in failing to use it seasonably, as I have hereinbefore described, and such failure constituted negligence and a fault on the part of the Dauntless No. 7 and the respondent.

The damages were caused by the failure of the A. C. Dutton Lumber Corporation to furnish a seaworthy vessel, the Dutton No. 6 not being seaworthy for the purposes for which it was employed, and by the negligence of the Dauntless No. 7 and the respondent in failing to properly observe the No. 6, while in tow, and in seasonably discovering the list, which she took after 4:30 a. m., November 29, 1932, and in towing her with such list, at the rate of 6 to 7 miles an hour, and in not having the wrecking pump connected up and used to clear the Dutton No. 6 of water immediately after taking such list.

The Dauntless No. 7 and the respondent Dauntless Towing Line, Inc., are liable for one-half damages.

Decree may be entered in accordance with this opinion. Settle decree on notice.

Submit proposed findings of fact and conclusions of law in accordance with this opinion, for the assistance of the court, as provided by rule 46½ of the Admiralty Rules (28 USCA § 723), and rule 42 of the Admiralty Rules (28 USCA § 723) of this court.