**WALDIE v. THE PETER C. GALLAGHER et al.**

**THE SUSANNA E. WALDIE.**

**THE WILLIAMS NO. 52.**

No. 135.

Circuit Court of Appeals, Second Circuit.

Jan. 27, 1942.

Purdy & Lamb, of New York City (Edmund F. Lamb and Vincent A. Catoggio, Jr., both of New York City, of counsel), for appellant.

Foley & Martin, of New York City (James A. Martin and Christopher E. Heckman, both of New York City, of counsel), for appellee.

Before AUGUSTUS N. HAND, CLARK, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

A libel was filed against the tug Peter C. Gallagher and the scow Williams No. 52 for damages caused the scow Susanna E. Waldie when she broke loose from a tow outside Huntington Bay and grounded on Lloyds Neck. The libel was dismissed after a trial, and the owner of the Waldie appeals from the decree dismissing as to the Gallagher, which she charges with negligent towage. There is no appeal from the dismissal of the libel against the Williams No. 52.

The tow in question consisted of seven barges which left Port Jefferson, Long Island, about 4:30 on the afternoon of October 2, 1938, bound for New York. Appellant was the second barge, the leading or "hawser" barge being the Williams No. 52. The Williams No. 52, as well as the third and fourth barges, were loaded with gravel, the appellant and the last two barges with sand, and the fifth barge with a split load of sand and gravel. Before setting out, the tug took the customary precautions to ascertain the weather, and determined that the voyage would not be imprudent. It cannot be seriously argued that the weather was unsafe for the departure, although we will assume arguendo that libellant correctly asserts that the Gallagher knew that north or northeast winds might be expected, causing a choppy sea, and that this possibility was to be taken into account in making up the tow.

At about 8:40 in the evening, the wind freshened and swung around to the northeast. The captain of the tug immediately decided to make for Huntington Harbor. About an hour later, the tide turned, and the wind increased further. This made the water very choppy. Soon after 10 P. M., as the tow was rounding Eatons Neck into Huntington Harbor, the stern bitts on the Williams No. 52, the hawser barge, broke off, casting loose the other six barges. The master of the tug knew this almost immediately, and turned his searchlight on the drifting barges. However, he first took the Williams No. 52 into quiet water and left her near a stake boat. Then he returned. By this time, the Waldie and the third barge had broken off from the last four. The tug picked up the four, and started into the harbor with them. Two of these four became separated, so the tug had to make another trip for them. By this time, the Waldie and the number 3 barge had become separated, and the Waldie had grounded, so that it was impossible for the tug to get her off. This caused the damage in suit.

It is clear that the Gallagher was not negligent in setting out. Nor can we find anything in her conduct after the breakup of the tow which can be stigmatized as negligent. On the contrary, she seems to have done as much as was reasonably possible. The barge on which she still had a line, the Williams No. 52, had no

stern bitts, which would have made it difficult to pick up the other barges. When she returned, it was obviously sound judgment to attempt to take in the four boats that were together at that time, rather than the other two, including the libellant's barge. This hardly shows a "deliberate and wrongful sacrifice" of the Waldie. What appellant seems to demand is that the tug-master should have attempted to reassemble his scattered tow in the choppy sea and taken them all to port at once, or else that he should have abandoned the rest of the barges and saved the Waldie. Under the circumstances, reassembling the tow was impossible. It cannot, of course, be successfully contended that a tug-master can pick up any particular barges only at the peril of being held liable for the others, so long, at least, as his choice is not malicious or clearly capricious.[1]

■ The remaining claim is that there was negligence in the makeup of the tow. Appellant asserts that, upon proof of damage to a barge, the tug must bear the burden of explaining the accident and of showing that her conduct was proper, citing The Reichert Line, 2 Cir., 64 F.2d 13; The Stirling Tomkins, 2 Cir., 56 F.2d 740. We need not pass on whether such a broad construction of those cases is in conflict with Stevens v. The White City, 285 U.S. 195, 202, 52 S.Ct. 347, 76 L.Ed. 699; cf. Commercial Molasses Corp. v. New York Tank Barge Corp., November 17, 1941, 62 S.Ct. 156, 86 L.Ed. ——, since, whatever the presumption established by the cases cited by appellant, it is applicable only when the accident occurs "under circumstances in which, if proper care is exercised in performing a similar service, such misfortune does not ordinarily occur." The Clarence P. Howland, 2 Cir., 16 F.2d 25, 26. Such circumstances did not exist here; the immediate cause of the accident was the breaking, in a choppy sea, of the stern bitts on the Williams No. 52. Seven barges was not an excessive number, and it is conceded that the bitts appeared, at the time of departure, to be sound and firmly anchored. Appellant's case, therefore, depends on whether the use of the Williams No. 52 as the leading barge was negligent.

Appellant's barge, the Waldie, had been loaded three or four days before with wet sand. By sailing time, this had dried out, lightening the load, so that, according to appellant's testimony, which was accepted by the trial court, she had a freeboard at the bow of about five feet, i. e., the top of the barge was five feet above water. The Williams No. 52, which was directly ahead, had a stern freeboard of only eighteen inches to two feet. Appellant's theory of the case is that it was improper to use a barge with such a low freeboard as the hawser barge, directly in front of a barge with a relatively high freeboard. The argument is that this difference in freeboard caused the lines to incline upwards, putting an unusual strain on the bitts, which, in the rough sea that was encountered, was responsible for their giving way.

The bitts on the Williams were of the single or "collar-button" type, of approved design, material and construction. There was some evidence that the type of bitt on the stern of the Waldie, the double steel bitt, is somewhat stronger, but there was no proof that the single bitt, if in good condition, is not considered adequate for a hawser barge of a seven-barge tow. Further, there was a good reason for not using the Waldie as the hawser barge, in that she was loaded with sand. There was evidence to the effect that a sand barge should not be placed in the lead, because the head barge takes the brunt of the sea, and sand has a tendency to wash off. One witness said that, if rough weather is encountered, enough may wash off to cause the barge to capsize. We cannot accept the theory that, because its bitts were not as strong as the Waldie's, the Williams No. 52 should not have been used as lead barge.

■ Appellant's argument that the difference in freeboard between the stern of the Williams No. 52 and the bow of the Waldie was fatal must also be rejected. There was no evidence that the bitts broke as the result of an upward strain; it is quite possible that the strain was parallel or even downward. More important, how-

---

[1] We do not understand appellant to assert that the Waldie was jettisoned for the welfare of all so that the damage must be shared in general average. It is familiar doctrine that a tug and its tow are not engaged in a common maritime adventure in the relation of carrier and cargo, The J. P. Donaldson, 167 U.S. 599, 17 S.Ct. 951, 42 L.Ed. 292, and, in the instant case, the Gallagher was not benefitted and could not in any case be held. No appeal was taken from that part of the decree dismissing as to the Williams No. 52, one of the barges saved.

ever, is that there was a square conflict in the evidence with regard to whether or not the difference in freeboard made it improper to put the Waldie behind the Williams No. 52. The trial court referred to this conflict in evidence, and found that there was no negligence in the makeup of the tow. As we have said before, we will not undertake to make a re-evaluation of such conflicting testimony. See Johnson v. Andrus, 2 Cir., 119 F.2d 287.

Since there was no negligence on the part of the tug Gallagher in the performance of its contract of towage, the District Court did not err in dismissing the Waldie's libel.

Decree affirmed.